# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WEST PALM BEACH** | : | |
| **POLICE PENSION FUND,** | : | **CIVIL ACTION** |
| **on behalf of itself and all others** | : | |
| **similarly situated,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DFC GLOBAL CORP., et al.,** | : | **No. 13-6731** |
| **Defendants.** | : | |

## MEMORANDUM

**Schiller, J.**                                                                                    **April 9, 2014**

Who wants to be lead plaintiff in a securities fraud class action litigation? The Court must select from three suitors after West Palm Beach Police Pension Fund filed a class action lawsuit against DFC Global Corp. alleging violations of federal securities laws. Because this is a class action federal securities case, the Private Securities Litigation Reform Act ("PSLRA") applies. According to the PSLRA, the Court must appoint as lead plaintiff the "most adequate plaintiff," defined as the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members. The Court must also approve the selection of lead counsel. Three movants filed the appropriate papers seeking to be lead plaintiff: (1) the "Institutional Investor Group," which includes the West Palm Beach Police Pension Fund ("West Palm Beach Fund"), the Arkansas Teachers Retirement System ("Arkansas Teachers"), the Macomb County Employees Retirement System ("Macomb County"), and the Laborers' District Council and Contractors' Pension Fund of Ohio ("Laborers' District"); (2) the Plumbers & Pipefitters National Pension Fund ("Plumbers and Pipefitters"), and (3) the City of Hollywood General Employees' Retirement Fund ("City of Hollywood").

For the following reasons, the Court names the Institutional Investor Group as lead plaintiff and approves as lead counsel the selection of Barrack Rodos & Bacine and Bernstein Litowitz Berger & Grossmann.

## I.      BACKGROUND

### A.      Factual Background

DFC Global is a non-bank provider of "alternative financial services" such as payday loans and secured pawn loans. (Compl. ¶ 2.) DFC Global operates in the United Kingdom, Ireland, Canada, the United States, and a number of European countries. (*Id*. ¶ 3.) The bulk of its revenue is from the United Kingdom and Ireland. (*Id*.) West Palm Beach Fund provides retirement benefits for police officers. (*Id*. ¶ 14.) As of September 30, 2012, it managed over $211 million in assets. (*Id*.) It bought DFC Global stock during the class period and suffered damages as a result of the securities laws violations alleged in the Complaint. (*Id*.)

Plaintiffs bought shares of DFC Global's publicly traded common stock between January 28, 2011 and August 22, 2013. (Compl. ¶ 1.) They allege that DFC Global misrepresented to investors that it complied with government regulations regarding lending practices, and that it made prudent, conservative, and responsible underwriting decisions when making loans. (*Id*. ¶ 6.) DFC Global also "knowingly misrepresented its loss rates for loans, and issued false earnings guidance of between $2.35 and $2.55 per diluted share for its 2013 fiscal year. As a result of Defendants' false statements and fraudulent course of conduct, DFC Global common stock traded at artificially inflated prices." (*Id*.) DFC issued high-fee loans to customers despite knowledge that the customers would not be able to repay the loans, continuously rolled over and refinanced loans to avoid defaults, understated

loan loss rates, and failed to comply with industry regulations and guidance. (*Id*. ¶ 7.)

The Complaint alleges a number of false statements related to the nature of the loans DFC Global provided to its clients. For example, in January 2011, DFC Global's CEO and Chairman, Jeffrey Weiss, stated during the company's second quarter earnings conference call that DFC Global's diversification strategy would "significantly mitigate the potential [risk] to our business for any potential future degradation in the overall credit landscape of our customer base or unstable development in regulatory environments in the countries in which we operate." (*Id*. ¶ 27.) Randy Underwood, DFC Global's Executive Vice President, CFO, and Assistant Secretary, highlighted the company's conservative approach to extending consumer credit. (*Id*.) DFC Global also filed false and misleading financial documents. For instance, its 10-K for the fiscal year ending June 30, 2012, pointed out that "the Company actively monitored the quality of the loans it originated" and that the company "reviewed borrower information and utilized sophisticated proprietary methodologies to ensure that DFC Global's loans complied with guidelines and that borrowers could repay the loans." (*Id*. ¶ 36.)

Plaintiffs sum up the allegations of misrepresentations as follows: DFC Global concealed from investors that the company: (1) systematically issued high-fee predatory loans to consumers that had no reasonable means to be repaid; (2) continuously rolled over or refinanced loans to delay or avoid defaults; (3) failed to conduct adequate affordability assessments on customers; (4) understated its loan loss rates; (5) inflated earnings; and (6) failed to comply with industry regulations and guidance. (*Id*. ¶ 66.) This conduct artificially inflated the stock price, which plummeted when the misrepresentations and fraudulent conduct were revealed. (*Id*. ¶ 67.)

B.      **Procedural Background**

The PSLRA applies to private federal securities actions "brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). The law sets forth specific requirements that must be followed upon the filing of a complaint. Within twenty days of the filing of the complaint, the plaintiff must "cause to be published, in a widely circulated national business-oriented publication or wire service," notice to members of the purported class regarding "the pendency of the action, the claims asserted therein, and the purported class period." *Id*. § 78u-4(a)(3)(A)(i)(I). Within sixty days of the date on which the notice is published, "any member of the purported class may move the court to serve as lead plaintiff of the purported class." *Id*. § 78u-4(a)(3)(A)(i)(II).

On November 20, 2013, the law firms that filed the first complaint in the action, including Bernstein Litowitz, caused to be published notice on *Marketwired*, a widely-circulated, national, business-oriented news wire service. (Mot. of the Institutional Investor Grp. for Appointment as Lead Pl. and Approval of Lead Pl.'s Selection of Class Counsel Ex. A [Notice].) All three movants filed their motion to be appointed lead plaintiff within the time frame contained in the PSLRA. The notice and motion procedural requirements of the PSLRA have thus been met in this litigation.

II.     **DISCUSSION**

Before the Court are three motions filed on behalf of the movants seeking to be appointed lead plaintiff. Behind door number one is the Institutional Investor Group. It is comprised of  West Palm Beach Fund, Arkansas Teachers, Macomb County, and Laborers' District. Behind door number two is Plumbers & Pipefitters, and behind door number three is the City of Hollywood.

4

The PSLRA requires this Court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The lead, or "most adequate," plaintiff is presumed to the person or group of persons that "has the largest financial interest in the relief sought by the class; and otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id*. § 78u-4(a)(3)(B)(iii)(I)(bb-cc). This presumption can be rebutted only with proof that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id* § 78u-4(a)(3)(B)(iii)(II)(aa-bb). The most adequate plaintiff shall select and retain counsel, subject to court approval. *Id*. § 78u-4(a)(3)(B)(v). Finally, the PSLRA places restrictions on "professional plaintiffs": "Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." *Id*. § 78u-4(a)(3)(B)(vi).

This Court must first determine what entity or group qualifies as the presumptive lead plaintiff, which requires the requires this Court to identify the movant with the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The factors courts should consider when making this determination include: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs. *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001). Once the Court determines which entity has the greatest financial stake in the litigation, the Court should then determine whether that entity satisfies the requirements

of Rule 23 of the Federal Rules of Civil Procedure. *See id*. This inquiry requires the Court to make

an independent judgment as to whether the entity with the greatest financial stake has made a prima

facie showing of typicality and adequacy. *See id*. at 263.

### A.    Movants' Contentions

#### 1.    Institutional Investor Group

The Institutional Investor Group purports to be the movant with the largest financial interest

in this litigation because it suffered a loss of $923,872 using either the first-in-first-out ("FIFO") or

last-in-first-out ("LIFO") method of loss calculation. The Institutional Investor Group points out that

the sum value of its loss, shares purchased, and net funds expended is greater than the other potential

lead plaintiffs' combined totals in these three areas. (Mem. of Law in Further Supp. of the Mot. of

the Institutional Investor Grp. for Appointment as Lead Pl. and Approval of its Selection of Lead

Counsel [Institutional Investor Supplemental Br.] at 3-4.) According to the Institutional Investor

Group, the last-in-first-out method is the correct one to calculate losses in the lead plaintiff context.

(*Id*. at 4.)

The "members of the Institutional Investor Group are sophisticated institutional investors

with experience serving as fiduciaries, and are dedicated to maximizing the recovery to the Class

members in this action." (Mem. of Law in Supp. of the Mot. of the Institutional Investor Grp. for

Appointment as Lead Pl. and Approval of its Selection of Lead Counsel [Institutional Investor Br.]

at 7-8.) The Institutional Investor Group claims that its members came together as a group on their

own volition and that prior to filing its motion, the group discussed the merits of the litigation, and

the benefits of working together to prosecute this action. (*Id*. at 8; Institutional Investor Supplemental

Br. at 7-8.) The Institutional Investor Group also believes that its claims are typical of the claims of

6

the class because it bought DFC Global shares at inflated prices and suffered damages as a result of Defendants' fraud, and because it lacks conflicts with other class members. (Institutional Investor Br. at 8-10.) "Moreover, the members of the Institutional Investor Group have prior experience serving as fiduciaries and selecting, hiring, and overseeing lawyers in complex litigation, such as this one, which will ensure that the case is prosecuted vigorously, yet efficiently against all culpable parties." (Institutional Investor Supplemental Br. at 7-8.)

### 2.  *Plumbers and Pipefitters*

Plumbers and Pipefitters argues that it lost approximately $937,492 on its transactions in DFC Global stock. (Mem. of Law in Supp. of Mot. of Plumbers and Pipefitters Nat'l Pension Fund for Appointment as Lead Pl. and Approval of Selection of Counsel [Plumbers and Pipefitters Br.] at 6.) Plumbers and Pipefitters asserts that it satisfies the typicality requirement of Rule 23 because, "just like all other class members, it: (1) invested in DFC Global securities during the Class Period; (2) made those investments in reliance upon the allegedly materially false and misleading statements issued by the defendants; and (3) suffered damages thereby." (*Id*. at 8.) Plumbers and Pipefitters also claims that it is an adequate representative of the class because its interests match those of the class and there is no evidence of conflicts between Plumbers and Pipefitters and other class members. (*Id*. at 8-9; Plumbers & Pipefitters Nat'l Pension Fund's Resp. in Opp'n to Competing Mots. for Appointment as Lead Pl. [Plumbers and Pipefitter's Resp.] at 10.) Additionally, an institutional investor such as Plumbers and Pipefitters is "precisely the type of investor whose participation in securities class actions Congress sought to encourage." (Plumbers and Pipefitters Br. at 9.)

Plumbers and Pipefitters claims that it has the greatest financial stake in the litigation because it suffered a significantly larger loss than any other individual institutional investor. (Plumbers and

Pipefitter's Resp. at 4-5.) Plumbers and Pipefitters recommends using the FIFO method of loss calculation, which leads to a loss of $937,492. (*Id.* at 5.) For the sake of completeness, the loss suffered by Plumbers and Pipefitters under the LIFO method is calculated at $547,725. (*Id.* at 6.) From the standpoint of Plumbers and Pipefitters, it remains the entity with the largest financial stake, even using the LIFO method of calculation, because it lost more than any individual investor. (*Id.*) The Institutional Investor Group lost the most only if the Court uses the LIFO method and combines the losses of all of the individual investors in the group. (*Id.*) Although Plumbers and Pipefitters concedes that under certain circumstances, a court may appoint a group of unrelated investors, this Court should not aggregate the losses of the Institutional Investor Group because that would displace the "single institutional investor with the largest individual loss under both LIFO and FIFO." (*Id.* at 7.) Moreover, the Institutional Investor Group was pieced together by counsel for the sole purpose of being appointed lead plaintiff and gaining control of the litigation, a result that the PSLRA seeks to avoid. (*Id.* at 7-8.)

### 3. *City of Hollywood*

City of Hollywood seeks to be appointed lead plaintiff by attempting to highlight problems with the other movants. According to the City of Hollywood, its LIFO loss is $146,148. (Mem. of Law in Further Supp. of the Mot. of City of Hollywood Gen. Emps.' Retirement Fund for Appointment as Lead Pl. and in Opp'n to the Competing Mots. [City of Hollywood Mem.] at 5.) The City of Hollywood argues that the Institutional Investor Group was put together by counsel in order to become the plaintiff with the largest financial interest in the litigation and is therefore "an inferior candidate" to the City of Hollywood. (*Id.* at 5, 10-12.) It also charges Plumbers and Pipefitters with misconstruing its actual financial interests based on the large discrepancy between the Plumbers and

Pipefitters's losses based on the method of calculation. (*Id.* at 4-5.) The City of Hollywood also argues that the Institutional Investor Group's claims are not typical of the class's claims because certain members of the Institutional Investor Group sold off their shares prior to a false misrepresentation made by DFC Global and thus cannot demonstrate loss causation. (*Id.* at 5-8.) The City of Hollywood contends that Plumbers and Pipefitters and Arkansas Teachers are professional plaintiffs involved in a number of active cases and are therefore overtaxed. (*Id.* at 8-10.)

### B.      Naming a Presumptive Plaintiff

#### 1.      *Method of calculating financial stake*

The Court must decide how to calculate the losses of the movants to determine which movant has the largest financial interest in the relief sought by the class. It is acceptable for courts in the Third Circuit to use either the LIFO or FIFO method of loss calculation. *See Cortese v. Radian Grp.*, Civ. A. No. 07-3375, 2008 WL 269473, at *6 (E.D. Pa. Jan. 30, 2008) ("Courts have used both methods to calculate financial interest; the Third Circuit has not resolved whether any specific theory should always be used for loss causation analysis."). Under the FIFO method of calculation, a court matches the sale of a share of stock to the price paid for the oldest share remaining in inventory. *In re Cigna Corp. Secs. Litig.*, 459 F. Supp. 2d 338, 343 n.7 (E.D. Pa. 2006). Under the LIFO method of calculation, a court matches the sale of a share of stock to the price paid for the newest share in inventory. *Id.* at 343 n.6.

The Institutional Investor Group argues that the LIFO method of calculation is the proper method. Plumbers and Pipefitters notes that either method is acceptable but expresses a preference for the FIFO method of calculation. It also contends that it has the greatest financial stake in the litigation regardless of the method used, provided that the Court does not aggregate the losses of the

individual members of the Institutional Investor Group. The City of Hollywood does not profess a preference, although it notes that the trend is towards using the LIFO method.

For purposes of appointing lead plaintiff in this matter, this Court will employ the LIFO method of calculation. As one court noted, despite the use of the FIFO method to determine losses for tax purposes, "more recently, courts have preferred LIFO and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases." *In re eSpeed*, *Inc. Secs. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005). "The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." *Id.*; *see also Johnson v. Dana Corp.*, 236 F.R.D. 349, 352-53 (N.D. Ohio 2006) (explaining differences between LIFO and FIFO and employing LIFO because FIFO allows plaintiffs with significant pre-existing holdings of defendants' securities to profit substantially from defendant's misconduct and then turn around and show a loss for purposes of litigation).

### 2.   *Aggregation of losses*

In order to determine which entity suffered the greatest loss, the Court must determine whether to aggregate the losses of the individual members of the Institutional Investor Group. If so, that entity has the largest financial stake in the litigation. If not, Plumbers and Pipefitters has the largest financial stake of any single investor in the litigation, regardless of whether the Court uses the FIFO or LIFO method of calculation.

Unquestionably, a group of investors can serve as lead plaintiff. *See* 15 U.S.C. § 78u-4(B)(iii)(I) (referring to most adequate plaintiff as the person or "group of persons"). Moreover, the Third Circuit has stated that the "group of persons" need not be related to be appointed lead plaintiff. *See Cendant*, 264 F.3d at 266 ("The [PSLRA] contains no requirement mandating that the members

of a proper group be 'related' in some manner; it requires only that any such group 'fairly and adequately protect the interests of the class.'"). Accordingly, while courts may inquire about the connection amongst members of a movant group, the focus of the district court should be on whether the group can fairly and adequately protect the interests of the class, and not on relatedness. *Id*. at 266-67. The Third Circuit cautions that a lawyer-made group of investors created to ensure that particular counsel ended up as lead counsel could be deemed unsuitable for monitoring class counsel. *Id*. at 267. Accordingly, this Court must examine the way in which the Institutional Investor Group was created to determine whether its formation "would preclude it from fulfilling the tasks assigned to a lead plaintiff." *See In re Cendant*, 264 F.3d at 266. The Court must also consider the size of the group to ensure that the group's size will not render it unable to represent the class effectively and adequately. *Id*. at 267. The Third Circuit also stated in *Cendant* that "goal of the [PSLRA's] lead plaintiff provision is to locate a person or entity whose sophistication and interest in the litigation are sufficient to permit that person or entity to function as an active agent for the class." *Id*. at 266.

The fact that the law permits a group of investors to act as lead plaintiff does not mean that those in the group can aggregate their losses to achieve the status of lead plaintiff. The PSLRA is silent on the question of aggregation of losses, and courts have not adopted a uniform approach to addressing this question. *See Schriver v. Impac Mortg. Holdings, Inc.*, Civ. A. No. 06-31, 2006 WL 6886020, at *7 (C.D. Cal. May 2, 2006) (noting that some courts have "expressed reluctance to permit aggregation of individual investors' claimed losses to confer lead plaintiff status absent some showing that the proposed group members have some relationship independent of the litigation or that they will be able to coordinate their efforts" while other courts have refused to allow investor groups to serve as lead plaintiff); *but see, e.g.*, *Yanek v. Staar Surgical Co.*, Civ. A. No. 04-8007,

11

2004 WL 5574358, at *4 (C.D. Cal. Dec. 15, 2004) ("The majority of the courts have permitted plaintiffs to aggregate their losses for purposes of the lead plaintiff determination."); *Meyer v. Paradigm Med. Indus.*, 225 F.R.D. 678, 681 (D. Utah 2001); *In re Advanced Tissue Scis. Secs. Litig.*, 184 F.R.D. 346, 350 n.11 (S.D. Cal. 1998).

This lack of guidance from the PSLRA coupled with the lack of a definitive answer from the Third Circuit Court of Appeals on the issue of aggregation leads this Court to conclude that the wisest course of action is to employ a case-by-case approach given the unique facts of each litigation. *See In re eSpeed*, 232 F.R.D. at 99 (permitting aggregation for a small group of unrelated investors provided it "did not displace an institutional investor as presumptive lead plaintiff based on the amount of losses sustained"); *see also In re E. Spire Commc'ns, Inc. Secs. Litig.*, 231 F.R.D. 207, 210 (D. Md. 2000) ("It is thus apparent that the PSLRA permits but does not require the appointment of multiple plaintiffs to manage PSLRA litigation. Because the PSLRA does not recommend or delimit a specific number of lead plaintiffs, the lead plaintiff decision must be made on a case-by-case basis, taking account of the unique circumstances of each case."). The Third Circuit issued a clear pronouncement in *Cendant* that a group of unrelated investors can serve as lead plaintiff. The Court concludes that it may, but is not required to, aggregate the losses of a group of unrelated institutional investors seeking to be appointed lead plaintiff.

The circumstances here warrant aggregation of the losses of the members of the Institutional Investor Group. The Court understands and shares the concerns of Plumbers and Pipefitters and the City of Hollywood regarding lawyer-driven litigation in this field. The litigation promises to be complex, and there is a significant amount of money at stake. It is unsurprising that a battle to be appointed lead plaintiff and select lead counsel would ensue. The opportunity to direct this litigation

offers an incentive for creative lawyering and perhaps some gamesmanship. However, the individual members of the Institutional Investor Group submitted a joint declaration made under penalty of perjury that stated they asked their lawyers to "seek out like-minded investors and determined, after conferring with each other, to seek joint appointment as Lead Plaintiff." (Mot. of Institutional Investor Grp. for Appointment as Lead Pl. and Approval of its Selection of Lead Counsel Ex. G [Joint Decl.] ¶ 7.) As a result, the Institutional Investor Group held a conference call to discuss the merits of the case and the benefits of proceeding jointly, and to establish procedures to oversee the litigation and communicate among members of the group and their lawyers. (*Id.*) The declaration lays out the duties and obligations of the Institutional Investor Group should it be appointed lead plaintiff. The Institutional Investor Group also agrees to take full responsibility for providing fair and adequate representation and overseeing counsel and espouses its commitment to prosecuting this litigation vigorously and efficiently. (*Id.* ¶¶ 9-11.)

The Court has no reason to doubt the veracity of this declaration. Thus, this Court rejects the contention that the Institutional Investor Group was lawyer-created and concludes that ultimately, the individual members of the group decided to join together to litigate this action. Moreover, the Court is convinced that the Institutional Investor Group can "fairly and adequately protect the interests of the class," which is the Court's primary concern. *See In re Cendant*, 264 F.3d at 266-67. Collectively, the Institutional Investor Group manages over $13 billion in assets and possesses significant experience acting as fiduciaries and overseeing attorneys in complex litigation. (Joint Decl. ¶ 6.) The Institutional Investor Group appears to be composed of unrelated investors who suffered losses through DFC Global's purported fraud. However, focusing on the lack of a relationship between the members of the Institutional Investor is misplaced. Neither Plumbers and

13

Pipefitters nor the City of Hollywood has expressed to this Court why this group of unrelated investors would be unable to fairly and adequately protect the interests of the class. To date, the affidavits submitted by those in the Institutional Investor Group show a willingness and ability to work together, discuss the issues surrounding the merits of this litigation, and decide on a procedural course of conducting this litigation.

The Institutional Investor Group has alerted the Court that Plumbers and Pipefitters advocated in favor of aggregation of losses in a motion seeking to be appointed lead counsel in another case. The Court agrees that Plumbers and Pipefitters has argued in favor of aggregation in circumstances similar to those here. Although aggregation may not be the best course of action in every scenario, the Court approves of it here.

The Court concludes that the Institutional Investor Group, though made up of four unrelated members, may move together to be appointed lead plaintiff. Moreover, the Court will aggregate their losses. Because the Court aggregates losses here, the Institutional Investor Group has the largest financial stake in this litigation based on the number of shares purchased during the putative class period, the total net funds expended by the plaintiffs during the class period, and the approximate losses suffered by the plaintiffs. Thus, provided the Institutional Investor Group can satisfy the typicality and adequacy inquiry, it shall be deemed the presumptive lead plaintiff.

### 3. *Typicality and adequacy*

The movant need only make a prima facie showing that it satisfies the typicality and adequacy requirements. *Id*. at 263-64 ("The initial inquiry (i.e., the determination of whether the movant with the largest interest in the case "otherwise satisfies" Rule 23) should be confined to determining whether the movant has made a prima facie showing of typicality and adequacy.")

14

The typicality requirement demands that the movant does not stand in a different position from other class members and will not employ a different legal theory than other class members. *Id*. at 265; *see also Blake Partners, Inc. v. Orbcomm, Inc.*, Civ. A. Nos. 07-4517 & 4590, 2008 WL 2277117, at *6 (D. N.J. June 2, 2008) ("Where the claims asserted by the movant are based on the same legal theories and arise from the same event or practice or course of conduct that gives rise to the claims of the class members, the typicality requirement is satisfied."). The Institutional Investor group easily satisfies the typicality requirement. The claims of this group are representative of the claims of the class. The Institutional Investor Group was injured by artificially inflated DFC Global stock prices that resulted from materially false statements or omissions on the part of DFC Global. Because it appears at this early stage of the litigation that the Institutional Investor Group suffered the same injury as absent class members as a result of the same course of conduct on the part of DFC Global, and because it will raise the same legal issues as other class members, the typicality requirement is met here. *See Blake Partners*, 2008 WL 2277117, at *6; *see also In re Able Labs. Secs. Litig.*, 425 F. Supp. 2d 562, 567 (D. N.J. 2006).

The adequacy requirement demands that courts consider whether the movant is able to and motivated to vigorously represent the claims of the class, whether the movant has obtained adequate counsel, and whether there is a conflict between the movant's claims and those asserted on the class's behalf. *In re Cendant*, 264 F.3d at 265. "[A] court might conclude that the movant with the largest losses could not surmount the threshold adequacy inquiry if it lacked legal experience or sophistication, intended to select as lead counsel a firm that was plainly incapable of undertaking the representation, or had negotiated a clearly unreasonable fee agreement with its chosen counsel." *Id*. at 265-66. The court may also deny lead plaintiff status if it determines that the way in which a group

15

was formed or the manner in which it is constituted would prevent it from fulfilling the tasks assigned to a lead plaintiff. *Id*. at 266. The Institutional Investor Group meets the adequacy requirement. The movant can fairly and adequately protect the interests of the class if the movant and its attorneys are able to satisfy their obligations and have no conflicting interests with other class members. *Blake Partners*, 2008 WL 2277117, at *6. The members of the Institutional Investors Group are sophisticated entities that to date have demonstrated an ability and willingness to forcefully advocate for the class. Moreover, the Institutional Investor Group has selected counsel well versed in this area and able to devote the resources to this litigation. The Court also concludes that there are no conflicts that render the Institutional Investor Group unable to fulfill its obligations as lead plaintiff.

Finally, the Court must consider the size of the Institutional Investor Group because "[a]t some point, a group becomes too large for its members to operate effectively as a single unit." *In re Cendant*, 264 F.3d at 267 ("Courts must also inquire whether a movant group is too large to represent the class in an adequate manner."). There is no magic number at which a group become too unwieldy to effectively manage complex securities litigation. *Id*. However, the Third Circuit Court of Appeals  "agree[s] with the Securities and Exchange Commission that courts should generally presume that groups with more than five members are too large to work effectively." *Id*. The Institutional Investor Group is comprised of four members and all indications to date are that these four institutional investors are willing and able to effectively work together to further this litigation and to protect the interests of the class.

### C.    Rebuttal

The Institutional Investor Group is the presumptive lead plaintiff. However, that presumption

may be rebutted with proof from a class member that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id* § 78u-4(a)(3)(B)(iii)(II)(aa-bb). At this stage, the Court is not deciding whether a movant other than the presumptive lead plaintiff will do a better job protecting the interests of the class. *In re Cendant*, 264 F.3d at 268. Rather, the Court must determine whether another class member has proven that the Institutional Investor Group will not do a fair and adequate job. *Id.*

The briefing from Plumbers and Pipefitters proceeds as though it will be deemed the presumptive lead plaintiff and therefore offers no proof that the Institutional Investor Group is unable to fairly and adequately represent the interests of the class, or that it is subject to unique attacks. Instead, it attempts to position itself as the presumptive plaintiff through use of the FIFO method of calculation and argues that the losses of the Institutional Investor Group should not be aggregated because it is a lawyer-created and lawyer-driven group. The Court has rejected these arguments.

The City of Hollywood asserts that the Institutional Investor Group is subject to unique defenses. Specifically, West Palm Beach Fund, Macomb County, and Laborers' District sold all of the shares that they bought during the class period prior to DFC Global's final corrective disclosure. (City of Hollywood Mem. at 6.) It also claims that these plaintiffs will be unable establish loss causation  because they sold the stock before the truth was disclosed. (*Id.*) While the Court appreciates the standing argument that may surface during this litigation, at this juncture, the Institutional Investor Group is not disqualified from serving as lead plaintiff based on the fact that some of its members may have sold shares prior to a corrective disclosure. First, it appears as though the Arkansas Teachers does not face this issue as it retained shares throughout all of the alleged

17

disclosures. Second, "[l]oss causation does not require full disclosure and can be established by partial disclosure during the class period which causes the price of shares to decline." *In re Gen. Elec. Secs. Litig.*, Civ. A. No. 09-1951, at *4 (S.D.N.Y. July 29, 2009).

The Court concludes that neither Plumbers and Pipefitters nor the City of Hollywood has rebutted the Institutional Investor Group's presumptive status as lead plaintiff.

### D.      Professional Plaintiff Status

The City of Hollywood argues that Arkansas Teachers qualifies as a professional plaintiff under the PSLRA. "In the last three years, [Arkansas Teachers] has been appointed as a lead plaintiff in seven actions, as a representative party in an eighth action, and is currently seeking to be appointed as lead plaintiff in two other cases." (City of Hollywood Mem. at 9.) The Institutional Investor Group does not contest the numbers cited by the City of Hollywood. Rather, it argues that "Hollywood's contention that Arkansas Teacher is subject to the professional plaintiff provision of the PSLRA . . . is . . . devoid of merit" because "the professional plaintiff bar was not intended to apply to institutional investors such as Arkansas Teacher." (Reply Br. in Supp. of the Mot. of the Institutional Investor Group for Appointment as Lead Pl. and Approval of its Selection of Lead Counsel and in Opp'n to the Competing Mots. at 6.) It also argues that the Court retains the discretion to allow an entity to serve as a lead plaintiff even if it qualifies as a "professional plaintiff." (*Id*. at 6-7.)

"Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." *Id*. § 78u-4(a)(3)(B)(vi). The Court does not believe that the

18

professional plaintiff provision of the PSLRA excludes institutional investors such as Arkansas Teachers. The statute contains no explicit exemption for such entities. However, "the limitation against professional plaintiffs was not designed to be applied mechanically to institutional investors." *In re Vicuron Pharm., Inc. Sec. Litig.*, 225 F.R.D. 508, 512 (E.D. Pa. 2004). Additionally, the PSLRA favors institutional investors as lead plaintiffs because it is believed that their involvement will benefit absent class members. *See In re Cendant*, 264 F.3d at 273; *see also In re Herley Indus. Inc. Secs. Litig.*, Civ. A. No. 06-2596, 2010 WL 176869, at *4 n.4 (E.D. Pa. Jan. 15, 2010) (In drafting the PSLRA, Congress sought to encourage greater involvement of institutional investors in securities class actions."). Accordingly, the Court will exercise the discretion afforded it pursuant to the PSLRA and will not apply the professional plaintiff bar here.

### E.    Choice of Counsel

The PSLRA states that, "[t]he most adequate lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Although the lead plaintiff's right to select and retain counsel is not without limits, the power to choose a lawyer rests first with the lead plaintiff and the court retains the power to approve that selection. *In re Cendant*, 264 F.3d at 273-74. A district court should interfere with that selection only if necessary to protect the interests of the class. *See id.*

No interference is necessary here. The Institutional Investor Group has retained the firms of Barrack Rodos and Bernstein Litowitz to act as lead counsel for the class. This Court has minimal experience observing the lawyers from these two law firms (and all of those observations have come in this litigation) and will therefore reserve for another day judgment of their advocacy and stewardship skills. However, the two firms have included numerous examples of their successes—

19

as judged by the millions of dollars they have secured for class members in settlements in complex securities actions. They also note their ability to try cases and to develop the law in the securities class action field. (Institutional Investor Br. at 11-12.) The Court notes that lawyers from these firms were involved in the *Cendant* litigation, which courts in this District, including this one in this matter, liberally quote from when faced with competing motions for appointment as lead plaintiff. This is not Barrack Rodos and Bernstein Litowitz's first rodeo. Based on the filings before this Court, the Court concludes that these firms have the resources, knowledge, and drive to vigorously and efficiently prosecute this litigation and protect the interests of the class. Therefore, the Court approves their selection and retention as lead counsel.

III.   **CONCLUSION**

The Court appoints the Institutional Investor Group as lead plaintiff and approves its selection of counsel. The motions of Plumbers and Pipefitters and the City of Hollywood for appointment as lead plaintiff are therefore denied. An Order consistent with this Memorandum will be docketed separately.