# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WEST PALM BEACH** | : | |
| **POLICE PENSION FUND,** | : | **CIVIL ACTION** |
| **on behalf of itself and all others** | : | |
| **similarly situated,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DFC GLOBAL CORP., et al.,** | : | **No. 13-6731** |
| **Defendants.** | : | |

## <u>MEMORANDUM</u>

**Schiller, J.**                                                                                           **June 16, 2015**

The payday loan industry allows individuals who do not have ready access to cash to secure loans so that they can pay bills. DFC Global Corp. ("DFC Global") was a leader in the field. According to the West Palm Beach Police Pension Fund, the Arkansas Teacher Retirement System, the Macomb County Employees' Retirement System, and the Laborers' District Council and Contractors' Pension Fund of Ohio (collectively, "Plaintiffs"), DFC Global misled investors about DFC Global's lending practices. When the fraud was revealed, the price of the stock plummeted, thereby causing great harm to investors, including Plaintiffs and the purported class they seek to represent. Presently before the Court are two motions to dismiss: one filed by DFC Global and numerous executives and members of the board of directors, and one filed by entities which underwrote a DFC Global stock offering. For the reasons that follow, the motions to dismiss are denied.

## I. FACTUAL BACKGROUND

### A. The Payday Loan Industry and Regulation

DFC Global provides unsecured short-term consumer loans, often referred to as "payday loans," and secured pawn loans, primarily to unbanked and under-banked consumers. (Consol. Class Action Compl. ¶ 20.) "DFC Global maintains the largest market share of all payday lenders in the U.K. and is the largest pawn lender in Europe measured by loan portfolio." (*Id*.) DFC Global's U.K. business operated under various names, including The Money Shop, Dollar Financial, Month End Money, and Payday Express Limited. (*Id*. ¶ 43.) Jeffrey Weiss was the Chairman and CEO of DFC Global since 1990; Randy Underwood was the CFO since 2004; William Athas was the CAO and senior vice president of finance and corporate controller since 2011. (*Id*. ¶¶ 23-25.) Defendants David Jessick, Kenneth Schwenke, Clive Kahn, John Gavin, Ronald McLaughlin, and Michael Kooper have all served on DFC Global's board of directors. (*Id*. ¶¶ 28-33.) Defendants Credit Suisse and Nomura Securities International, Inc. served as underwriters for DFC's April 2011 common stock offering and were responsible for ensuring the truthfulness and accuracy of the statements made in the offering materials. (*Id*. ¶¶ 35-37.)

Payday loans are small loans made to customers experiencing short-term money problems. (*Id*. ¶ 39.) DFC Global made money from payday loans in three ways: (1) origination fees when the loans were issued; (2) interest rates for loans paid off in their initial term; and (3) interest rates for rolled-over loans. (*Id*. ¶¶ 40-41.) If a borrower could not repay a loan when it came due, he or she could roll over, or extend, the loan by paying the finance charge to keep the loan current. (*Id*. ¶ 41.) Payday loans are risky loans because the customer is often "unemployed, underemployed or otherwise income-restrained." (*Id*. ¶ 42.) DFC Global's customers typically fell into two

demographics: ALICE (asset limited, income constrained and employed) and ARTI (asset rich, temporarily illiquid). "ALICE customers are generally struggling workers that are forced to hold more than one low-paying job in order to satisfy their monthly bills and living expenses. ARTI customers, on the other hand, often fall within several income and wealth categories, but generally include temporarily unemployed individuals in need of short-term credit." (*Id.*)

DFC Global "distinguished itself from its competitors as a conservative lender and manager of risk," touting its "'conservative approach to extending consumer credit,'" its "'very effective' credit analytics function," its "ability to underwrite a customer's ability to repay." (*Id.* ¶ 44.) DFC Global held itself out as "'a leader for responsible behavior in the marketplace.'" (*Id.*) Investors relied on DFC Global's conservative approach to help the company withstand additional regulation in the payday loan industry and ensure that the company would appropriately manage risk. (*Id.* ¶ 45.) DFC Global is a charter member of the Consumer Finance Association ("CFA"), the industry's leading trade association. (*Id.*)

Payday lenders in the U.K. must adhere to regulations of the Consumer Credit Act and guidance on lending from the Office of Fair Trading ("OFT"). (*Id.* ¶ 46.) In 2011, the OFT deemed certain lending practices to be irresponsible, including: (1) failing to establish and implement effective policies and procedures to assess affordability; (2) failing to undertake a reasonable assessment of affordability; and (3) encouraging borrowers to roll over existing debt. (*Id.* ¶ 47.) The Consumer Credit Act mandated that lenders assess borrower creditworthiness based on sufficient information obtained from the borrower and a credit reference agency, if necessary, to ensure that the borrower could reasonably repay the loan. (*Id.* ¶ 48.) Payday lenders were also instructed to work with borrowers having trouble repaying their loans, including developing a repayment plan that did

not increase the borrower's indebtedness. (*Id*. ¶ 49.)

During the class period, scrutiny of payday lenders in the U.K. increased. For example, following an extensive review of fifty payday lenders, including DFC Global, the OFT announced that these lenders faced enforcement actions if they did not improve their lending practices. (*Id*. ¶¶ 50, 95.)

### B.  DFC Global's Lending Practices

The Consolidated Class Action Complaint paints a bleak picture of DFC Global's business practices. Contrary to public statements, "DFC Global's underwriting and risk management practices were not 'conservative' or 'responsible.' The Company also misled investors about critical metrics reported in DFC Global's financial results, including its loan loss reserves and net income." (*Id*. ¶ 54.)  DFC Global extended loans to those who could not repay them and repeatedly rolled over loans to borrowers for a fee in order to avoid reporting defaults without any additional credit assessment. (*Id*. ¶ 54.) To make their case, Plaintiffs relied on a number of confidential witnesses to explain DFC Global's lending practices. These confidential witnesses, employees of DFC Global, contended that the company made risky loans with little or no oversight or concern about the ability of the borrower to repay the loan. (*See id*. ¶¶ 58-69.) For example, loans were often approved without verifying a borrower's income or determining if the borrower could repay the loan. (*Id*. ¶¶ 58-60.) One confidential witness stated that The Money Shop would target borrowers with bad credit, calling them into the store to offer loans. (*Id*. ¶ 61.) Indeed, "the Company's overriding focus was on generating more loans. . . . Management instructed employees to do whatever it took to get a loan." (*Id*. ¶ 62.) Management would often override a decision to reject a loan. (*Id*.) DFC Global also targeted those in desperate need of cash, a practice barred by the OFT and the Consumer

Finance Association. (*Id.* ¶ 63.)

Rollovers were vital to DFC Global, as they generated at least 60% of the company's total payday lending revenue. (*Id.* ¶ 80.) The company also had a policy of pressing borrowers to rollover their loans, thereby generating new fees and delaying defaults by deeming as current rolled over loans. (*Id.* ¶ 69.) These repeated rollovers were often made without any additional assessment as to whether the borrower could repay the loan. (*Id.* ¶ 70.) This practice was contrary to OFT guidance. (*Id.* ¶¶ 70-71.) Confidential witnesses stated that there were no limits on the number of times a borrower could roll over a loan, and that employees had rollover quotas. (*Id.* ¶¶ 73-77.) Indeed, borrowers were encouraged to roll over loans rather than pay them off, even if the borrower did not understand the financial implications of continuous rollovers. (*Id.* ¶ 73.) DFC Global executives, including Weiss, Underwood, and Athas, regularly discussed loan rollovers and how they affected the bottom line of DFC Global. (*Id.* ¶ 78.)

"During the Class Period, defendants repeatedly represented that the Company had instituted a credit analytics function that effectively managed risk in its consumer loan activities, and the Executive Defendants certified in quarterly and annual SEC filings that the Company had instituted adequate internal controls." (*Id.* ¶¶ 81-82.) However, despite public statements to the contrary, Athas later admitted on behalf of DFC Global that the company could not consistently track loan data on a global basis. (*Id.* ¶ 83.) In reality, the company "utterly failed to effectively manage its risk by not analyzing rollovers or extensions on a global basis and taking them into account when extending credit or setting the Company's loan loss reserves." (*Id.* ¶ 84.) Confidential witnesses supported this allegation: "There was nothing in place for monitoring the quality of the loans." (*Id.*)

Moreover, Plaintiffs charged, DFC Global's decision to exclude rolled-over loans from its

loan loss reserves violated generally accepted accounting principles. (*Id*. ¶ 85.) "[C]ontrary to the Company's representations that it complied with GAAP, the Company understated its loan loss reserves in order to inflate its income and to disguise the poorly underwritten and high-risk loans in its loan portfolio." (*Id*. ¶ 87.) DFC Global also failed to properly account for rolled over loans by treating them as new, current loans rather than placing them into default. (*Id*. at 88-91.) "In doing so, the Company effectively wiped out the negative credit history associated with borrowers who had a demonstrated inability to repay their loans." (*Id*. ¶ 88.) DFC Global's policy of treating rolled over loans as new loans with no additional risk came directly from senior management. (*Id*. ¶ 89.) Following the OFT's increased regulatory scrutiny, DFC Global had to increase its loan loss reserves as its borrowers increasingly defaulted. (*Id*. ¶ 92.)

## C. The OFT Report

Following its investigation, the OFT reported that the U.K. payday lending industry was rife with irresponsible lending practices, including the failure to properly assess affordability. (*Id*. ¶ 96.) "The OFT report revealed exactly the types of practices that DFC Global had been engaged in throughout the Class Period. In fact, each of DFC Global's subsidiaries operating in the U.K. received letters from the OFT identifying deficiencies in operations." (*Id*. ¶ 98.) DFC Global was warned that if changes were not implemented within ninety days, DFC Global's business units that provided payday loans in the U.K. would be shut down. (*Id*. ¶ 98.)

Despite statements to the contrary from Weiss, the company failed to comply with lending regulations, and "the governing bodies . . . had grave doubts that DFC Global could ever become compliant in light of its business practices." (*Id*. ¶¶ 100-01.) For example, a confidential witness stated that the company "never got in compliance with the OFT's regulations, despite the Company's

purported assurance to the contrary." (*Id.* ¶ 101.) The same confidential witness claimed that DFC Global rolled over loans more than three times, even though the company assured others that it was in compliance with the rollover rule that disallowed so many rollovers. (*Id.* ¶ 102.)

### D. False Statements

Plaintiffs alleged that "[t]hroughout the Class Period . . . defendants regularly made statements about DFC Global's 'conservative approach' to underwriting, distinguishing the company from its competitors as a 'responsible' lender, and reassured investors that its approach to extending credit was designed to 'get the money back.'" (*Id.* ¶ 106.) For instance, during a January 27, 2011 conference call, Weiss stated, "The implementation of what we believe to be industry leading proprietary credit scoring model and our continued conservative approach to extending consumer credit in the midst of a still-weakened economy resulted in a loan loss provision expressed as a percentage of growth consumer lender revenue of 16.6%." (*Id.* ¶ 107.) During a June 7, 2011 conference, Weiss stated, "We have, we think, the best analytics, underwriting and collection metrics in the industry." (*Id.* ¶ 108.) Underwood stated that DFC Global "undertook a conscious effort to . . . become more selective in the loans we put out, not knowing exactly where the recession was going, probably less money on the table, and we're pretty certain of that, but we feel a lot better about things having a very conservative approach during the recession until we saw what was going to ultimately happen." (*Id.* ¶¶ 108-09.)

During a January 26, 2012 conference call to discuss the company's second quarter 2012 results, Weiss stated:

> Well, first we like to get the money back, not only to give it out. So that's always our most important consideration. But I think it's a combination of really many years of investment in credit analytics

and the really superior work of our credit analytics group, which encompasses not only underwriting, but the ability to stratify our borrowers and make sure collections are effective. Secondly, our decade of experience in storefront lending has provided us with a base of knowledge and experience that I think is relatively unique in this space.

\* \* \*

We can underwrite to the ninth decimal point a customer's ability to repay. We're getting better at underwriting a customer's willingness to repay.

(*Id*. ¶ 111.) On January 24, 2013, Weiss praised the company's ability to keep its second quarter 2013 losses lower than expected:

First we are more selective. Again, repeating what I said, no trick in giving the money out. I think we are more selective particularly in the UK, given the regulatory issues that we have discussed. I think we continue to improve in our ability to figure out how much to lend and to whom and how to collect from people who have difficulty making a full or partial repayment on time. But I think it's part and parcel of our considered stance to the environment in the UK.

(*Id*. ¶ 114.) Weiss assured analysts that further regulation of the industry would be helpful to DFC Global:

What we have discovered is regulation is the friend of the responsible. . . . We think that we are on the road to [a] situation in the UK where lots of small lenders who simply lack the infrastructure or inclination to build the appropriate credit analytics and responsible collection apparatus will no longer be able to participate in the marketplace because relevant authorities will simply prevent it.

(*Id*. ¶ 115.) Plaintiffs contend that these statements were false, as DFC Global was neither conservative nor selective. Rather, it did not adhere to even minimal underwriting standards and instead targeted individuals unlikely to pay back their loans. (*Id*. ¶ 116.) The failure to disclose DFC Global's shortcomings meant that "investors were misled about the Company's true lending practices

and the creditworthiness of the Company's loans." (*Id*. ¶ 117.)

DFC Global's SEC filings contained numerous false and misleading statements regarding its purportedly effective credit analytics, risk management and related financial results. DFC Global's second quarter 2011 Form 10-Q (repeated in numerous other SEC filings) stated:

> The Company has instituted control mechanisms and a credit analytics function that have been very effective in managing risk in its consumer loan activities. Collection activities are also an important aspect of the Company's operations, particularly with respect to its consumer loan products due to the relatively high incidence of unpaid balances beyond stated terms. The Company operates centralized collection centers to coordinate a consistent approach to customer service and collections in each of its markets. The Company's risk control mechanisms include, among others, the daily monitoring of initial return rates with respect to payments made on its consumer loan portfolio.

(*Id*. ¶¶ 118-19.) During an April 30, 2012 conference call discussing the company's third quarter 2012 fiscal results, Underwood said:

> [O]ur vast investment in credit analytics folks, and we have them in several of our business units, as well as corporately, I think certainly has paid off for us many, many times over. And it not only helps out on the front end but it certainly helps out on the back end as we prioritize how to go about collection activities. So, I think we're happy being what we think is pretty conservative. It very well could be that we'd be leaving money on the table [by lowering underwriting standards] . . . But we think our performance is just fine with being as cautious as we are[.]

(*Id*. ¶ 125.) In SEC filings, the company also touted its centralized facilities, which "have helped us both to improve our loan servicing significantly and to reduce credit losses on loans originated by us, and significantly enhances our ability to manage the compliance responsibilities related to our consumer lending operations." (*Id*. ¶ 126.) In reality, and contrary to these numerous false and misleading statements, DFC Global's deficient lending and credit assessment practices increased the

company's credit risk and related losses. (*Id*. ¶ 129.) The company also lied about monitoring loans and "being in the forefront of government and community relations on regulatory issues." (*Id*. ¶¶ 130-33.)

Additionally, DFC Global made false statements about the payment status of loan, as well as its loan loss reserves. The company failed to report properly the actual payment status for loans that it rolled over by categorizing such loans as extended or current, when the loans were essentially past due. (*Id*. ¶¶ 135-36.) "By categorizing rolled over or extended loans as current, the Company avoided classifying them as past due and disclosing the true attendant credit risks and losses." (*Id*. ¶ 136.) DFC Global also failed to inform investors that it performed almost no underwriting when the loans were first originated or when they were subsequently rolled over. (*Id*. ¶ 139.) "The Company's loss reserve policy . . .  and its reported net income, loan loss provision, and loan loss reserve . . . were each false and misleading because when calculating its loan loss reserve, the Company did not take into account the increased credit risk of its loans due to its deficient underwriting; the increased credit risk of continuously rolling over loans without conducting additional underwriting; or the true past due nature of the rolled over loans." (*Id*. ¶ 142.) These practices led DFC Global to understate its loan loss reserve and to overstate its net income. (*Id*. ¶¶ 142-43.)

### E.    Performance Issues

On April 1, 2013, DFC Global preannounced its third fiscal quarter 2013 results in a press release filed with the SEC and a conference call. (*Id*. ¶ 151.) The company reported that its consolidated loan loss provision as a percentage of gross consumer lending revenue was expected to spike. (*Id*.) This spike impacted the company's reported net income, which declined. (*Id*.) DFC

Global also reported that it was cutting its earnings per share by nearly 30%. (*Id.* ¶ 152.) On April 1, 2013, DFC Global's stock price fell from $16.64 to $13.04. (*Id.*) Despite these performance issues, Weiss and Underwood continued to tout the company as a responsible lender that maintained conservative underwriting practices. (*Id.* ¶¶ 153-54.) Weiss stated that DFC Global remained confident that it was well positioned for the long term "as irresponsible lenders are eventually targeted by the OFT and removed from the UK market." (*Id.* ¶ 153.) When the company announced its third fiscal quarter results on May 1, 2013, its consolidated loan loss provision as a percentage of gross consumer lending spiked more than previously anticipated. (*Id.* ¶ 156.) DFC Global also confirmed that the company's three business units in the U.K. that provided payday and single payment loans received "action required" letters from the OFT regarding their improper lending practices in a number of areas. (*Id.* ¶ 157.) Weiss discounted this news as a "bump in the road" and Underwood "continued to misleadingly describe the Company's lending practices during the regulatory transition period as responsible." (*Id.* ¶ 158.) When DFC Global reported its fiscal year 2013 earnings, it announced that defaulting loans would continue to be a problem through at least the first half of fiscal year 2014. (*Id.* ¶ 160.) Underwood also announced that DFC Global expected to incur $10-$15 million in expenses every year for regulatory, legal, audit, and compliance-related costs. (*Id.* ¶ 161.) This news sent the company's stock down from a close of $15.90 on August 22 to $11.31 on August 23. (*Id.*)

On October 30, 2013, DFC announced that as a result of higher loan defaults in the United Kingdom, its loan loss provision had increased. (*Id.* ¶ 163.) Weiss also explained that DFC Global instituted a number of restrictive changes to assure investors that the company maintained a conservative regulatory posture. (*Id.*) Underwood reported that poor performance was the result of

confusion about regulatory requirements; he also stated that he believed the stock was a bargain. (*Id.* ¶ 164.)

DFC Global's loan losses caused it to experience liquidity problems. (*Id.* ¶ 166.) These liquidity problems led the company to announce a private offering of senior notes to institutional investors. (*Id.*) The company was forced to withdraw the offering just a few days later, however, because "it could not draw sufficient investor interest in its debt." (*Id.*) This withdrawal caused a drop in the price of DFC Global stock. (*Id.*) Moreover, the company's consolidated loan loss provision continued to increase. (*Id.* ¶ 167.) The price of the stock continued to decline; on January 31, 2014, the price decreased from $10.57 to $7.52. (*Id.* ¶ 168.) "Defendants falsely blamed the Company's poor financial results on the fact that regulatory guidance in the U.K. was not yet definitive and that its competitors were engaging in lending practices that DFC Global had stopped." (*Id.* ¶ 169.) On February 3, 2014, Norm Miller, DFC Global's President and COO, resigned. (*Id.* ¶ 170.) On February 4, 2014, the price of the stock fell further, from $7.09 to $6.76. (*Id.*)

On April 1, 2014, the Financial Conduct Authority ("FCA") took control over payday lending in the United Kingdom (*Id.* ¶ 173.) On April 2, 2014, DFC Global announced that it had entered into an agreement with Lone Star Funds, a private equity company, to take DFC Global private. (*Id.*) Pursuant to the agreement, DFC Global shareholders were slated to receive $9.50 in cash per share of common stock. (*Id.*) Shareholders approved the merger on June 6, 2014, which was viewed as "the Company's only viable escape route, given the Company's apparent inability to operate under the new regulations." (*Id.* ¶¶ 177-78.) On June 13, 2014, DFC Global announced that its acquisition by Lone Star Funds had been completed. (*Id.* ¶ 179.) On July 1, 2014, the FCA's new regulations went into effect. (*Id.* ¶ 180.)

## F. Scienter and Loss Causation Allegations

Plaintiffs allege that DFC Global, Weiss, Underwood, and Athas knowingly or recklessly made materially false and misleading statements and omissions about DFC Global's conservative underwriting practices and responsible lending practices, DFC Global's effective credit analytics, the payment status of the Company's payday loans, as well as the Company's financial results and internal controls. (*Id*. ¶ 189.) According to Plaintiffs, Defendants' scienter is demonstrated by a number of facts. First, the fraud concerned DFC Global's core product and a key business area, unsecured loans. (*Id*. ¶ 191.) Second, regulators engaged in ongoing and extensive investigation of the industry. (*Id*. ¶ 192.) Third, "the immediacy and magnitude of the initial default determinations that the Company was forced to disclose after the new regulations took effect and the OFT announced the results of its investigation in March 2013 is further evidence of scienter." (*Id*. ¶ 193.) Fourth, executives of DFC Global sought to prop up the stock price and to maintain the illusion of conservative business practices so that DFC Global could be sold. (*Id*. ¶ 194.) Plaintiffs consider it suspicious that only two months after OFT began investigating payday lenders in the U.K., DFC Global hired a global investment bank to seek out financial sponsors that might want to acquire the Company. (*Id*.) Defendants were then handsomely rewarded when DFC Global was sold. (*Id*.) Fifth, key executives departed suddenly and suspiciously. (*Id*. ¶ 195.) Sixth, DFC Global took a constant and widespread reckless approach to underwriting payday loans, as well as the continuous rolling over of those loans. (*Id*. ¶ 196.) DFC Global maintained a policy in which employees regularly contacted borrowers to encourage them to roll over loans rather than place the loans in default. (*Id*.) Seventh, Weiss, Underwood, and Athas repeatedly made public statements extolling the Company's sound approach to consumer lending at the same time they were aware of warnings about the

Company's inability to comply with regulations. (*Id.* ¶ 197.) Moreover, according to confidential witnesses, Weiss and Underwood were personally involved in monitoring the number of payday loans and rollovers that DFC Global generated on a monthly basis in the U.K. (*Id.* ¶ 198.) Furthermore, it was DFC Global's policy to ignore rollovers when setting quarterly loan loss reserves. (*Id.* ¶ 199.) Plaintiffs also state that "Company management knew that DFC Global's payday lending business was not in compliance with OFT regulations after they were implemented, and that the Company could not be compliant with the new FCA rules." (*Id.* ¶ 200.) Finally, Defendants used the false and misleading information about the Company to raise millions in capital through a secondary offering of DFC Global's common stock. (*Id.* ¶ 201.)

With respect to loss causation and economic loss, Plaintiffs allege that they purchased DFC Global common stock at artificially inflated prices only to have the price of the stock decline significantly when the fraud was revealed. (*Id.* ¶¶ 202-03.) Plaintiffs would not have bought stock in DFC Global at the prices they did if Defendants had disclosed the truth. (*Id.* ¶ 203.)

### G.     Plaintiffs' Claims

Plaintiffs filed a class action lawsuit on behalf of all persons who purchased shares of DFC Global common stock during the class period, specifically between January 28, 2011 and February 3, 2014. Plaintiffs' first claim for relief is made pursuant to §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, alleging that DFC Global and the Executive Defendants carried out a scheme to deceive the investing public through false statements and material omissions. (*Id.* ¶¶ 224-232.) Their second claim for relief is made pursuant to § 20(a) of the Securities Exchange Act of 1934, alleging controlling person liability against Weiss, Underwood, and Athas.

Plaintiffs also bring claims pursuant to the Securities Act of 1933. Plaintiffs state that these

strict liability and negligence claims that "do not allege, and do not sound in, fraud." (*Id.* ¶ 239.) With respect to these non-fraud claims, Plaintiffs allege that on April 7, 2011, DFC Global conducted a public offering of six million shares of common stock at $20.75 per share. (*Id.* ¶ 241.) This offering generated $130.2 million in gross proceeds for DFC Global; Plaintiff Arkansas Teacher purchased 28,500 shares in the offering. (*Id.* ¶¶ 241-42.) The offering was conducted pursuant to a registration statement filed with the SEC and signed by Weiss and Underwood. (*Id.* ¶ 243.) The company issued a prospectus, which it later supplemented. The offering materials contained materially untrue and misleading statements and omissions about DFC Global's effective credit analytics and risk management, the payment status of the company's payday loans, its financial results, and its internal results. (*Id.* ¶ 244-260.)

Plaintiffs' third claim for relief is brought pursuant to § 11 of the Securities Act of 1933 against all Defendants based on the false and misleading statements made in materials published for the offering. (*Id.* ¶¶ 261-71.) The fourth and fifth claims for relief are brought pursuant to §§ 12(a)(2) and 15 of the Securities Act of 1933, respectively. (*Id.* §§ 272-85.)

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the nonmoving party. *See Powell v. Weiss*, 757 F.3d 338, 341 (3d Cir. 2014). A court need not, however, credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 260 (3d Cir. 2007); *see also Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). "Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. Although the Federal Rules of Civil Procedure impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Simply reciting the elements will not suffice. *Id*. (holding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Phillips*, 515 F.3d at 231. The Third Circuit has established a two-part analysis of a motion to dismiss for failure to state a claim. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id*. at 211. If the court can only infer the possibility of misconduct, the complaint must be dismissed because it has alleged—but failed to show—that the pleader is entitled to relief. *Id*.

   When faced with a motion to dismiss, a court must consider the complaint in its entirety, including documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

### B. Private Securities Litigation Reform Act

Private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought by the Department of Justice and the Securities and Exchange Commission. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). But, wielded improperly, such private actions can exact an incredible toll on undeserving companies and individuals. *Id.* Accordingly, the Private Securities Litigation Reform Act of 1995 ("PSLRA") sought to curb abusive private securities fraud actions. To further that objective, the law requires that in all such private securities lawsuits, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, for those cases in which the plaintiff must show that the defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). Failure to comply with either of these requirements "shall, on the motion of any defendant" lead to dismissal of the complaint. *Id.* § 78u–4(b)(3).

The PSLRA sets forth the appropriate standard to use in private securities actions, although Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity is nearly identical to § 78u–4(b)(1)'s demands. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). The scienter pleading requirement found in the PSLRA, however, is more stringent than the requirements of Rule 9(b). *Id.* The threshold to survive a motion to dismiss under the PSLRA is high. For a complaint to create a "strong inference that the defendant acted" with scienter,

the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *Avaya*, 564 F.3d at 267. "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 267-68. This standard requires courts to consider plausible opposing inferences to fraud. *Tellabs*, 551 U.S. at 323-24.

## III. DISCUSSION

Defendants provide myriad reasons for the Court to dismiss Plaintiffs' claims, including their contention that Plaintiffs' claims must be dismissed because their whole argument is "predicated on the impermissible fraud-by-hindsight theory." (Mem. of Law in Supp. of Defs.' Mot. to Dismiss Consolidated Class Action Compl. [Defs.' Mem.] at 3.) In addition, according to Defendants, Plaintiffs' Securities Exchange Act claims must be dismissed because: (1) Plaintiffs failed to allege a misstatement or omission of material fact that was false or misleading when made; (2) most of the allegedly fraudulent statements are non-actionable statements of belief or opinion, forward-looking statements protected by the Private Securities Litigation Reform Act's safe harbor, or statements of puffery; (3) Plaintiffs failed to plead scienter properly; and (4) Plaintiffs failed to plead loss causation properly. (*Id*. at 4-5.) As for claims brought pursuant to the Securities Act, Defendants argue that those should be dismissed because: (1) the statute of limitations has expired; (2) Plaintiffs have not alleged a specific material misstatement or omission; and (3) the § 15 claim is derivative of the §§ 11 and 12(a)(2) claims. (*Id*. at 5.)

### A.       Securities Exchange Act of 1934

####       1.       Elements of the claim

The federal securities laws aim to protect investors from deceptive practices. *See* 15 U.S.C.

§ 78j (granting SEC power to establish rules to further statute forbidding manipulative or deceptive

devices in connection with purchase or sale of securities). Rule 10(b)–5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state
> a material fact necessary in order to make the statements made, in
> light of the circumstances under which they were made, not
> misleading, or
> © To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, a

plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with

the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura*

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). A misstatement or omission is material if there

is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the total mix of information made available." *TSC*

*Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

####       2.       Arguments of the parties

Defendants dispute with Plaintiffs' claim that DFC Global failed to disclose that it

categorized rolled-over loans as current, thus failing to advise investors of the true credit risks and

losses. (Defs.' Mem. at 25-26.) They also claim that DFC Global was under no duty to inform

investors that borrowers who rolled over loans could not afford to pay back their loans because there

is no duty to state the obvious. (*Id*. at 26-27.) With respect to statements about DFC Global's loan loss reserves, Defendants claim that the adequacy of loan loss reserves is not a matter of objective fact, but rather that loan loss reserves reflect the subjective opinion of management. (Defs.' Mem. at 28-29.) Because statements about loan loss projections are opinions, Defendants argue, they are actionable only if such projections are not honestly believed and lack a reasonable basis. (*Id*. at 29.)

Plaintiffs allege that DFC Global mischaracterized the status of its loans, thereby avoiding disclosure of the true credit risks associated with its loan portfolio. (Pls.' Opp'n at 31.) The "generic and incomplete disclosures DFC Global made failed to accurately portray the status of the loans." (*Id*.) Plaintiffs allege that DFC Global "materially understated its loan loss reserves and overstated its income in violation of GAAP" when it "failed to properly account for its repeatedly rolled-over loans, which were effectively in default, and for its high-risk lending practices." (Pls.' Opp'n at 33.) According to Plaintiffs, statements about DFC Global's loan loss reserves are not inactionable statements of opinion, but rather qualify as statements of fact, and thus no showing of subjective falsity is required. (Pls.' Opp'n at 37-38.)

Numerous statements are at issue, many of which Defendants characterize as nonactionable statements of belief:

> The implementation of what we believe to be industry leading proprietary credit scoring model and our continued conservative approach to extending consumer credit in the midst of a still-weakened economy resulted in a loan loss provision expressed as a percentage of growth consumer lender revenue of 16.6%. (Consol. Class Action Compl. ¶ 107.)

***

> We have, we think, the best analytics, underwriting and collection metrics in the industry. (*Id*. ¶ 108.)

20

***

[O]ur decade of experience in storefront lending has provided us with a base of knowledge and experience that I think is relatively unique in this space. We can underwrite to the ninth decimal point a customer's ability to repay. We're getting better at underwriting a customer's willingness to pay. (*Id.* ¶ 111.)

***

Our industry association has promulgated its code of ethics on behalf of our membership. And we continue to look progressively towards the future of a more clarified environment in the UK, which I think will certainly benefit us and all responsible lenders. And irresponsible lenders may have some difficulties in the future. Hopefully we'll inure additional benefit to ourselves in the process. (*Id.* ¶ 112.)

***

First we are more selective. Again, repeating what I said, no trick in giving the money out. I think we are more selective particularly in the UK, given the regulatory issues that we have discussed. I think we continue to improve in our ability to figure out how much to lend and to whom and how to collect from people who have difficulty making a full or partial repayment on time. But I think it's part and parcel of our considered stance to the environment in the UK. (*Id.* ¶ 114.)

***

[T]he Company is "very good at doing the credit analysis and collection work that makes it a very good business for us. And we've spent a long, long time learning how to do it so that our losses do not eclipse our originations. (*Id.* ¶ 123.)

***

[O]ur vast investment in credit analytics folks, and we have them in several of our business units, as well as corporately, I think certainly has paid off for us many, many times over. And it not only helps out on the front end but it certainly helps out on the back end as we prioritize how to go about collection activities. So, I think we're happy being what we think is pretty conservative. It very well could be that we'd be leaving money on the table [by lowering underwriting standards] . . . But we think our performance is just fine with being

as cautious as we are[.] (*Id*. ¶ 125.)

These quotes are just a sampling of the statements that Plaintiffs allege were material misrepresentations. The Complaint is replete with additional statements and comments that Plaintiffs point to as misrepresenting the conservative nature of DFC Global's lending practices. (*See* Consol. Class Action Compl. ¶¶ 109-110, 115, 120-121, 124, 126, 128.)

### 3. *Material misrepresentation or omission*

#### a. *Statements of belief/opinions*

Defendants claim that a number of statements alleged by Plaintiffs to be fraudulent are nonactionable statements of belief and opinion, including those listed above. (Defs.' Mem. at 20-23.) According to Defendants, Plaintiffs must demonstrate that the opinions expressed are both objectively and subjectively false. (*Id*. at 21-22.) They assert that "Plaintiffs have averred no particularized facts showing that the defendants did not honestly believe their statements regarding the conservative nature of DFC's underwriting or that DFC's lending practice were responsible." (*Id*. at 22.) Further, "Plaintiffs have similarly failed to allege any particularized facts suggesting that DFC's opinion that it had a more conservative approach to underwriting, responsible lending practices, and/or effective credit analytics and risk management lacked a reasonable basis." (*Id*. at 23.)

Plaintiffs disagree and contend that Defendants' statements were material misstatements of present fact, not opinion. (Pls.' Opp'n at 26.) According to Plaintiffs, Defendants intentionally or recklessly omitted certain facts contrary to their representations that they employed conservative lending practices. (*Id*.) Even if some of Defendants' statements qualify as opinion, they are still actionable because they were made without a reasonable basis. (*Id*. at 26-27.) Plaintiffs assert this

premise applies here because "Defendants kept themselves apprised of, and paid particular attention to, the number of loans and rollovers generated by employees, while at the same time completely disregarding whether proper underwriting assessments were conducted before loans were reissued." (*Id*. at 27.)

Opinions, predictions and other forward-looking statements are not immunized from the reach of the securities laws. *In re Donald J. Trump Casino Secs. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 368 (3d Cir. 1993). However, "[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Counsel v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014).

The factual allegations in the Consolidated Class Action Complaint tell a tale of a far-reaching and egregious abdication of lending responsibility. At this stage of the proceedings, it is incorrect to conclude as matter of law that the statements highlighted by Defendants are opinions, let alone opinions lacking honest belief and a reasonable basis. If one were to posit that Babe Ruth's purported hijinks and carousing made him an immoral person, such a position would qualify as an opinion. An argument that Babe Ruth was not one of baseball's greatest power hitters is incorrect and adding the phrase "I believe" or "in my opinion" does not alter the analysis. Given the context in which these statements were made, the Court cannot conclude at this point in time that these statements constitute "squishy" terms, "too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *See City of Monroe Emps. Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). Moreover, the Court is unwilling to afford immunity to purported lies that defrauded investors because DFC Global executives carefully added "I think" or "we believe" to their statements.

Even if the Court were to agree with Defendants that some or all of the statements qualify as opinions, those statements remain actionable here. "[I]f a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). "By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Id*. Having allegedly failed to do so here, Defendants must answer for their conduct.

### b. Puffery

Next, Defendants argue that even if statements about the conservative nature of DFC Global's underwriting and statements about DFC Global's responsible lending practices were misleading, such statements were mere puffery or "generalized statements of optimism" and are therefore not actionable. (Defs.' Mem. at 24-25.) Plaintiffs disagree, arguing that representations about underwriting practices and credit quality are key pieces of information vital to investors. (Pls.' Opp'n at 28.)

Vague and general statements of optimism are "puffery." *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999). Puffery is not actionable under the securities law, even if misleading, because it is not material. *Id*.

The Court does not consider statements about the conservative nature of DFC Global's underwriting or its responsible lending practices to be puffery. Far from being a vague statement of intention or optimism, fraudulent comments regarding such a fundamental aspect of DFC Global's business are of vital importance to investors. *See, e.g.*, *In re Wilmington Trust Secs. Litig.*, 29 F.

Supp. 3d 432, 447 (D. Del. 2014) ("In discussing mitigating credit risk, WTC stated that it employed and 'consistently' applied 'rigorous loan underwriting standards.' These statements are not properly characterized as mere "puffery.'"); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (holding actionable statements about "strict underwriting and risk management disciplines"); *In re RAIT Fin. Trust Secs. Litig.*, Civ. A. No. 07-3148, 2008 WL 5378164, at *6 (E.D. Pa. Dec. 22, 2008) ("We cannot say that a statement claiming that RAIT's 'credit underwriting involves an extensive due diligence process' is mere puffery when Plaintiffs allege that RAIT 'did not conduct any meaningful ongoing credit analysis whatsoever.'").

### c.   Fraud-by-hindsight

Defendants accuse Plaintiffs of pleading fraud-by-hindsight. (Defs.' Mem. at 18-19.) Defendants charge that Plaintiffs failed to allege that when the company's supposedly false statements were made about the company's conservative underwriting and lending practices, those underwriting and lending practices were not conservative. (*Id.*) Plaintiffs counter that their allegations specifically plead that Defendants failed to comply with existing regulations about responsible lending and rolling over loans. (Pls.' Opp'n at 23-24.) Moreover, "contemporaneous facts demonstrate that they misrepresented DFC Global's compliance with its *own* stated policies and practices." (*Id.* at 24.) Despite Defendants' public statements to the contrary, DFC Global "focused on increasing loan-origination volume and rollover fees at the expense of credit quality." (*Id.* at 24-25.)

To be actionable, a misstatement or omission must have been misleading at the time it was made. *Winer Family Trust*, 503 F.3d at 331. Fraud by hindsight, defined as the "attempt to impose liability on management for unrealized economic predictions," is not a permissible basis for liability

under the securities laws. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *In re Nice Sys., Ltd. Secs. Litig.*, 135 F. Supp. 2d 551, 586 (D.N.J. 2001).

The Court finds that Plaintiffs are not relying on a fraud-by-hindsight theory. Plaintiffs repeatedly claim that DFC Global failed to use conservative lending and underwriting practices despite its comments to the contrary. Plaintiffs portray an industry run amok. At the time regulators tried to clean up the abuses of the industry, Plaintiffs claim that DFC Global, a company that engaged in numerous improper practices, lied about its abuses. The Consolidated Class Action Complaint includes allegations that loans were often approved without verifying a borrower's income and that loans were often rolled over without additional underwriting or affordability checks. Contrary to what DFC Global claimed at the time, this is not what a reasonable person would deem conservative lending practices.

### 4. Scienter

Defendants also claim that Plaintiffs have failed to plead scienter as required by the PSLRA, instead relying on conclusory terms that Defendants knew the statements they made were false at the time. (Defs.' Mem. at 38-39.) Defendants accuse Plaintiffs of attempting to plead recklessness through hindsight and impermissibly relying on the Defendants' positions in the corporation to impute knowledge of fraudulent statements. (*Id*. at 41-43.)

Plaintiffs argue that they have properly plead scienter. First, Plaintiffs point out that Defendants repeatedly "discussed the origination, credit analysis, accounting, review, and portfolio

characteristics of DFC's payday loans." (Pls.' Opp'n at 42.) Defendants held themselves out as possessing significant knowledge about DFC Global's payday loan portfolio. (*Id*.) The matters discussed by Defendants pertained to DFC Global's core business and primary source of revenue, and thus an inference of scienter is permissible. (*Id*. at 42-45.)

Plaintiffs also claim that they have demonstrated Defendants' recklessness through specific allegations of knowledge of facts or access to information that contradicted their public statements. (*Id*. at 46.) Specifically, Defendants recklessly touted their prudent, conservative, and responsible lending practices despite evidence that DFC Global originated loans without any meaningful underwriting. (*Id*. at 46-47.)

Plaintiffs also assert that "[t]he sheer magnitude and suddenness of DFC's credit losses and default determinations support a strong inference of scienter." (*Id*. at 50.) DFC Global went quickly from being a purported leader and conservative lender to a company "forced to disclose material increases to its loan loss reserves and increasing amounts of defaulted loans." (*Id*. at 50.) Plaintiffs also believe that the resignation of two senior executives is evidence of scienter. (Pls.' Opp'n at 53-54.) The departure of President and COO Norman Miller was particularly revealing because Miller was in charge of implementing the relevant regulations. (*Id*. at 54.)

To state a claim under the securities laws, the plaintiff must allege facts that permit a strong inference of either reckless or conscious behavior. *Avaya*, 564 F.3d at 252, 267. "To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, a 'mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). When deciding whether a plaintiff has raised an inference of scienter at the motion to dismiss stage, the court must:

(1) accept all factual allegations as true; (2) consider the complaint in its entirety, and examine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter; and (3) consider plausible opposing inferences to determine whether the pleaded facts meet the PSLRA's strong inference standard. *Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 704 (E.D. Pa. 2008). A complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. The relevant inquiry, however, is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23. To plead scienter properly, a plaintiff must allege facts that "constitute circumstantial evidence of either reckless or conscious behavior." *Avaya*, 564 F.3d 242, 276-77. Recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42.

The inference of scienter is strong here. The fact that the allegations of fraud relate to Defendants' core business supports such an inference. *See In re Viropharma Inc. Secs. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014); *see also Mill Bridge V, Inc. v. Benton*, Civ. A. No. 08-2806, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("Further, while a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter."). Payday loans accounted for a majority of DFC Global's revenues, generating hundreds of millions of dollars. (Consol. Class Action Compl. ¶ 191.)

Plaintiffs also rely in part on the statements of confidential witnesses to make their case that they have adequately pled scienter. In the case of confidential witness allegations, the court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263.

Based on a review of the allegations, the Court concludes that the confidential witnesses, whose positions afforded them first hand knowledge of the underlying facts, provide further evidence of at least reckless behavior. For example, one confidential witness, who served as the Head of Compliance for DFC Global's online business in the United Kingdom, claimed that DFC Global "never got in compliance with the OFT's regulations, despite the Company's purported assurance to the contrary. Nor was it in compliance with what would become the new, governing FCA requirements." (Consol. Class Action Compl. ¶ 101.) This same witness also claimed that DFC Global did not adhere to a three rollover limit set in 2012. (*Id*. ¶ 102.) Another confidential witness, who served as a senior manager in debt collection strategy, alleged that management dictated that rollovers were not to be considered when setting loan loss reserves. (*Id*. ¶ 199.) This witness recalled several high-level conference calls in which management ignored models demonstrating that increased regulations would have a harmful effect on DFC Global's debt collection revenues. (*Id*.) The Court also considers probative the allegation that shortly after the OFT's extensive review of the payday loan industry, DFC Global hired a global investment bank to gauge interest in purchasing the company. (*Id*. ¶ 194.) One confidential witness who worked for The Money Shop and Dollar Financial for four years as a store supervisor and manager could not recall a single instance in which

a borrower was rejected for a loan due to the potential inability to pay. (*Id*. ¶ 21.) Other confidential witnesses reported that loans were approved without verification of a borrower's income, that loans were made to individuals without regular income, and that customers were pressured to take loans, even "if a customer said he or she did not need a loan." (*Id*. ¶¶ 58-62.) Moreover, the company ran a national sales campaign aimed at bringing in an ever-increasing quantity of sales, often at the expense of the borrower's ability to pay. (*See id*. ¶¶ 64-66.) Finally, confidential witnesses noted a company-wide policy to push borrowers to roll over loans continuously. (*Id*. ¶ 69.)

Finally, Plaintiffs also point to the resignation of key executives to support their assertion that Defendants acted with the requisite scienter. Generally, the resignation of key officers is insufficient to show scienter to commit the alleged fraud. *In re Interpool, Inc. Secs. Litig.*, Civ. A. No. 04-321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005). However, when considering the totality of Plaintiffs' scienter allegations, the Court concludes that the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior.

Generally speaking, the Court believes that Defendants have underestimated the predatory nature of the alleged conduct explicitly set forth in the allegations of the Consolidated Class Action Complaint. For years, according to Plaintiffs, DFC Global maintained a policy of making loans to individuals without regard to their ability to pay and subsequently and repeatedly gouged those customers by allowing and even encouraging them to roll over those loans continuously. If Plaintiffs' allegations are proven, DFC Global was making loans to individuals with little to no assurance that it would recover the money. The Court further rejects DFC Global's argument that it was unaware of the impact that new regulations might have on its business. Even if this is true, waiting to assess

the effects of regulations while the business sinks is like Nero fiddling while Rome burns: reckless.

### 5. Loss causation

To demonstrate loss causation at this stage, a plaintiff allege facts to show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). At this stage, however, a plaintiff need only offer a "short and plain statement," which gives "fair notice" of the plaintiff's claim. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

The issue of loss causation is a fact-sensitive question often left to the fact finder. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000); *see also Omanoff v. Patrizio & Zhao LLC*, Civ. A. No. 14-723, 2015 WL 1472566, at *6 (D.N.J. Mar. 31, 2015) ("While Defendants argue that the titanic decline in share price is attributable to several material weaknesses . . . disclosed during this period, this is a factual dispute that cannot be adjudicated at this early stage."). Moreover, "[t]he disclosure of the alleged fraud need not be the sole reason for the depreciation of the stock price; rather, plaintiff must allege facts that indicate the misrepresentation inflated the stock price, and the truth had a proximate and negative impact on the value of stock." *In re Urban Outfitters, Inc. Secs. Litig.*, Civ. A. No. 13-5978, 2015 WL 2069222, at *14 (E.D. Pa. May 4, 2015). There is no requirement that the disclosure mirror the earlier misrepresentation. *See id*. Rather, the misrepresentation may be revealed through "whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals." *Marsden v. Select Med. Corp.*, Civ. A. No. 04-4020, 2007 WL 1725204, at *2 n.6 (E.D. Pa. June 12, 2007).

Plaintiffs have satisfied their burden at this early stage. Plaintiffs have alleged that as the truth

31

came out, the stock price declined precipitously. For example, when DFC Global announced that it was required to enact changes that would address regulatory compliance issues, the stock price fell by 29%. (Consol. Class Action Compl. ¶ 161.) The stock further declined when its President and COO resigned, as well as when DFC Global continued to reveal the effects of the regulatory changes in the industry. (*Id*. ¶¶ 152, 161, 166-68, 170.) The Complaint includes allegations sufficient to conclude that stock market prices reflected the market's eventual understanding that DFC Global's claims of conservative underwriting and lending practices were false. The industry, which had relied on questionable business practices, was collapsing, and DFC Global's true—but concealed—lending practices were uncovered.

### 6. The PSLRA Safe Harbor

Defendants claim that the challenged statements about DFC Global's loan loss reserves were forward-looking statements accompanied by meaningful cautionary language such that they are entitled to the protections of the PSLRA's safe harbor provision. (Defs.' Mem. at 30-35.)

The PSLRA's safe harbor provision excepts from liability forward-looking statements identified as such, provided they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or "immaterial." 15 U.S.C. § 78u-5(c)(1)(A). A forward-looking statement is also protected if "the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. A statement is forward-looking if it contains "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" or "any statement of the assumptions underlying or relating to any statement described in subparagraph (A)." *Id*. § 78u-

5(i)(A) & (D).

The Court will not dismiss any of Plaintiffs' claims as a result of the PSLRA's safe harbor provision. For one, the Court is not persuaded that statements about DFC Global's loan loss reserves qualify as forward-looking statements here. "Statements about loss reserves and their adequacy are not per se forward-looking." *In re PMA Capital Corp. Secs. Litig.*, Civ. A. No. 03-6121, 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005).

Plaintiffs allege that DFC Global maintained a practice whereby its loan loss reserves failed to take account of loans that had been rolled over. Attempts to convince investors about the adequacy of its loan loss reserves rang hollow because DFC Global insisted on reckless lending behavior despite promises to the contrary. Again, Defendants have understated the breadth and egregiousness of the fraudulent conduct asserted here. This is not simply a case in which a company mistakenly believed it had adequate reserves to cover defaulted loans. Rather, Plaintiffs claim that loan loss reserves would never be adequate because DFC Global lied about its lending practices. DFC Global loaned money indiscriminately. Yet it informed the investing world that it made conservative lending decisions and used its resources to selectively underwrite loans. The law provides no safe harbor for such false statements. At this juncture, the Court will not dismiss Plaintiffs' claims. *See Winslow v. Bancorp South, Inc.*, Civ. A. No. 10-463, 2011 WL 7090820, at *17-18 (M.D. Tenn. Apr. 26, 2011) (noting that it was imprudent to grant motion to dismiss based on safe harbor provision "[b]ecause the questions about whether a financial institution intended to mislead investors regarding loan loss reserves and whether statements in relation thereto are false cannot be decided in the abstract").

7.      *Section 20(a) claim*

Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against

individuals who exercise control over a corporation that has committed a violation of Section 10(b). 15 U.S.C. § 78t(a); *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006). Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the corporation. *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act." (internal quotation marks omitted)).

Defendants' argument for dismissing this claim relies on dismissal of the underlying securities fraud claim. Plaintiffs have stated a claim for securities fraud and Defendants have offered no additional reasons to dismiss the 20(a) claim at this time. Accordingly, the 20(a) claim survives.

### B.      Securities Act of 1933

To state a claim under § 11 of the Securities Act, "plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement." *In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004). To state a claim under § 12(a)(2), "plaintiffs must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication." *Id*.

Defendants, including Credit Suisse Securities (USA) LLC ("Credit Suisse") and Nomura Securities International, Inc. ("Nomura"),[1] argue that Plaintiffs' claims brought under the Securities Act are time-barred. The law directs that "[n]o action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery

_____

[1] Credit Suisse and Nomura acted as underwriters of DFC Global's April 7, 2011 offering, in which it sold approximately six million shares of DFC Global common stock. (Consol. Class Action Compl. at 1 & ¶¶ 35-37.) As underwriters, these entities "were responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials." *(Id*. ¶ 37.)

of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.

According to Defendants, the OFT's public announcement that it was conducting a review of the payday lending industry—which occurred more than one year prior to the filing of the Securities Act claims on March 21, 2014—placed them on notice such that reasonable diligence would have led to discovery of Plaintiffs' claims. (Defs.' Mem. at 53-54.) Specifically, Credit Suisse and Nomura argue that "publicly available facts enabled Plaintiffs to plead their misrepresentation and omission claims by August 29, 2012 (and certainly no later than March 6, 2013). . . . As early as February 24, 2012, the OFT publicly questioned whether DFC and other payday lenders were (i) conducting appropriate pre-loan affordability analyses and (ii) rolling over payday loans as they came due." (Underwriter Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss Counts III and IV of the Consol. Class Action Compl. at 5-6.) Credit Suisse and Nomura also point out that more than a year before Plaintiffs asserted their Securities Act claims against Credit Suisse and Nomura, OFT issued a press release about its interim findings as well as its final report. (*Id*. at 8-9.)

The statute of limitations is an affirmative defense and the burden rests with the defendant to establish that statute of limitations has expired. *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013). A case may not be dismissed based on the statute of limitations unless the defense "appear[s] on the face of the complaint." *Id*. However, "matters of public record and items appearing in the record of the case [can] reveal that the claims in the Original Complaint were untimely." *Id*. A discovery standard applies to claims brought under the Securities Act. *Id*. at 273 (citing *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2009)). That is, the statute of limitations "begins to run once the plaintiff did discover

or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." *Operating Eng'rs*, 730 F.3d at 276 n.6 (citing *Merck*, 130 S. Ct. at 1798).

It is too soon to dismiss the Securities Act claims based upon the statute of limitations. The parties dispute whether Plaintiffs had access to certain facts that Plaintiffs claim were necessary to allege the untruth of DFC Global's statements before the statute of limitations expired. (*See* Pls.' Opp'n at 66.) Accordingly, the Court will not dismiss the Securities Act claims based on the statute of limitations at this time, but Defendants may raise this issue in a summary judgment motion.

Likewise, the Court will not dismiss Plaintiffs' Securities Act claims for failure to state a claim. For many of the same reasons that the Court has refused to dismiss the Securities Exchange Act claims, the Court concludes that Plaintiffs have stated a claim for violation of the Securities Act.

## IV.  CONCLUSION

Though the law affords heightened pleading standards for Plaintiffs seeking to assert securities fraud claims, this Court still must accept as true the well pleaded factual allegations of the Consolidated Class Action Complaint. Plaintiffs have met their burden at this stage of the proceedings. Therefore, the Court will deny Defendants' motions to dismiss and permit this matter to move forward. An Order consistent with this Memorandum will be docketed separately.