**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WEST PALM BEACH** | : | |
| **POLICE PENSION FUND,** | : | **CIVIL ACTION** |
| **on behalf of itself and all others** | : | |
| **similarly situated,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DFC GLOBAL CORP., et al.,** | : | **No. 13-6731** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                 **August 4, 2016**

Lead Plaintiffs, the Arkansas Teacher Retirement System, the Macomb County Employees

Retirement System, and the Laborers' District Council and Contractors' Pension Fund of Ohio, have

sued DFC Global Corp.; directors and executives Jeffrey Weiss, Randy Underwood, William Athas,

David Jessick, Kenneth Schwenke, Clive Kahn, John Gavin, Ronald McLaughlin (collectively, the

"Executive Defendants"); and underwriters Credit Suisse Securities (USA) LLC, and Nomura

Securities International, Inc. (Collectively, the "Underwriter Defendants"). They allege Defendants

violated the securities laws by misleading them and other investors about the lending practices of

DFC Global, causing them to lose a significant amount of their investments. Presently before the

Court is Lead Plaintiffs' Motion for Class Certification. For the reasons provided below, the Court

grants the motion.

I.      **BACKGROUND**[1]

    A.      **The Payday Loan Industry and Regulation**

DFC Global provides unsecured short-term consumer loans, often referred to as "payday loans," and secured pawn loans, primarily to unbanked and under-banked consumers. (Consol. Class Action Compl. ¶ 20.) "DFC Global maintains the largest market share of all payday lenders in the U.K. and is the largest pawn lender in Europe measured by loan portfolio." (*Id.*) DFC Global's U.K. business operated under various names, including The Money Shop, Dollar Financial, Month End Money, and Payday Express Limited. (*Id.* ¶ 43.) At the time the Consolidated Class Action Complaint was filed, Jeffrey Weiss had been the Chairman and CEO of DFC Global since 1990; Randy Underwood had been the CFO since 2004; and William Athas had been the Chief Accounting Officer, Senior Vice President of Finance, and Corporate Controller since 2011. (*Id.* ¶¶ 23-25.) Defendants David Jessick, Kenneth Schwenke, Clive Kahn, John Gavin, Ronald McLaughlin, and Michael Kooper have all served on DFC Global's board of directors. (*Id.* ¶¶ 28-33.) Defendants Credit Suisse and Nomura Securities International, Inc., served as underwriters for DFC's April 2011 common stock offering and were responsible for ensuring the truthfulness and accuracy of the statements made in the offering materials. (*Id.* ¶¶ 35-37.)

    Payday loans are small loans made to customers experiencing short-term money problems. (*Id.* ¶ 39.) DFC Global made money from payday loans in three ways: (1) origination fees when the loans were issued; (2) interest rates for loans paid off in their initial term; and (3) interest rates for rolled-over loans. (*Id.* ¶¶ 40-41.) If a borrower could not repay a loan when it came due, he or she could roll over, or extend, the loan by paying a finance charge to keep the loan current. (*Id.* ¶ 41.)

_____

[1] This factual recitation is taken largely from the Court's June 16, 2015 Memorandum.

Payday loans are risky loans because the customer is often "unemployed, underemployed or otherwise income-restrained." (*Id*. ¶ 42.) DFC Global's customers typically fell into two demographics: ALICE (asset limited, income constrained, and employed) and ARTI (asset rich, temporarily illiquid). "ALICE customers are generally struggling workers that are forced to hold more than one low-paying job in order to satisfy their monthly bills and living expenses. ARTI customers, on the other hand, often fall within several income and wealth categories, but generally include temporarily unemployed individuals in need of short-term credit." (*Id*.)

DFC Global "distinguished itself from its competitors as a conservative lender and manager of risk," touting its "'conservative approach to extending consumer credit,'" its "'very effective' credit analytics function," and its "ability to underwrite a customer's ability to repay." (*Id*. ¶ 44.) DFC Global held itself out as "a leader for responsible behavior in the marketplace." (*Id*.) Investors relied on DFC Global's conservative approach to help the company withstand additional regulation in the payday loan industry and ensure that the company would appropriately manage risk. (*Id*. ¶ 45.) DFC Global is a charter member of the Consumer Finance Association ("CFA"), the industry's leading trade association. (*Id*.)

Payday lenders in the United Kingdom must adhere to regulations of the Consumer Credit Act and guidance on lending from the Office of Fair Trading ("OFT"). (*Id*. ¶ 46.) In 2011, the OFT deemed certain lending practices to be irresponsible, including: (1) failing to establish and implement effective policies and procedures to assess affordability; (2) failing to undertake a reasonable assessment of affordability; and (3) encouraging borrowers to roll over existing debt. (*Id*. ¶ 47.) The Consumer Credit Act mandated that lenders assess borrower creditworthiness based on sufficient information obtained from the borrower and a credit reference agency, if necessary, to

ensure that the borrower could reasonably repay the loan. (*Id*. ¶ 48.) The Act also instructed payday lenders to work with struggling borrowers to develop repayment plans that would not increase the borrower's indebtedness. (*Id*. ¶ 49.)

During the class period, scrutiny of payday lenders in the U.K. increased. For example, following an extensive review of fifty payday lenders, including DFC Global, the OFT announced that these lenders would face enforcement actions unless they improved their lending practices. (*Id*. ¶¶ 50, 95.)

**B.      DFC Global's Lending Practices**

The Consolidated Class Action Complaint paints a bleak picture of DFC Global's business practices. Contrary to public statements, "DFC Global's underwriting and risk management practices were not 'conservative' or 'responsible.' The Company also misled investors about critical metrics reported in DFC Global's financial results, including its loan loss reserves and net income." (*Id*. ¶ 54.)  DFC Global extended loans to those who could not repay them and repeatedly rolled over loans to borrowers for a fee, without any additional credit assessment, in order to avoid reporting defaults. (*Id*. ¶ 54.) To make their case, Plaintiffs rely on a number of confidential witnesses to explain DFC Global's lending practices. These confidential witnesses, employees of DFC Global, contend that the company made risky loans with little or no oversight or concern about the ability of the borrower to repay the loan. (*See id*. ¶¶ 58-69.) For example, loans were often approved without verifying a borrower's income or determining if the borrower could repay the loan. (*Id*. ¶¶ 58-60.) One confidential witness stated that The Money Shop would target borrowers with bad credit, calling them into the store to offer loans. (*Id*. ¶ 61.) Indeed, "the Company's overriding focus was on generating more loans. . . . Management instructed employees to do whatever it took to get

4

a loan." (*Id*. ¶ 62.) Management would often override a decision to reject a loan. (*Id*.) DFC Global also targeted those in desperate need of cash, a practice barred by the OFT and the CFA. (*Id*. ¶ 63.)

Rollovers were vital to DFC Global, as they generated at least 60% of the company's total payday lending revenue. (*Id*. ¶ 80.) The company also had a policy of pressing borrowers to roll over their loans, thereby generating new fees and delaying defaults by deeming as current rolled-over loans. (*Id*. ¶ 69.) These repeated rollovers were often made without any additional assessment as to whether the borrower could repay the loan. (*Id*. ¶ 70.) This practice was contrary to OFT guidance. (*Id*. ¶¶ 70-71.) Confidential witnesses stated that there were no limits on the number of times a borrower could roll over a loan, and that employees had rollover quotas. (*Id*. ¶¶ 73-77.) Indeed, borrowers were encouraged to roll over loans rather than pay them off, even if the borrower did not understand the financial implications of continuous rollovers. (*Id*. ¶ 73.) DFC Global executives, including Weiss, Underwood, and Athas, regularly discussed loan rollovers and how they affected the bottom line of DFC Global. (*Id*. ¶ 78.)

"During the Class Period, [D]efendants repeatedly represented that the Company had instituted a credit analytics function that effectively managed risk in its consumer loan activities, and the Executive Defendants certified in quarterly and annual SEC filings that the Company had instituted adequate internal controls." (*Id*. ¶¶ 81-82.) However, despite public statements to the contrary, Athas later admitted on behalf of DFC Global that the company could not consistently track loan data on a global basis. (*Id*. ¶ 83.) In reality, the company "utterly failed to effectively manage its risk by not analyzing rollovers or extensions on a global basis and taking them into account when extending credit or setting the Company's loan loss reserves." (*Id*. ¶ 84.) Confidential witnesses supported this allegation, one of them reporting that: "There was nothing in place for monitoring the

5

quality of the loans." (*Id*.)

Moreover, Plaintiffs charge, DFC Global's decision to exclude rolled-over loans from its loan loss reserves violated generally accepted accounting principles ("GAAP"). (*Id*. ¶ 85.) "[C]ontrary to the Company's representations that it complied with GAAP, the Company understated its loan loss reserves in order to inflate its income and to disguise the poorly underwritten and high-risk loans in its loan portfolio." (*Id*. ¶ 87.) DFC Global also failed to properly account for rolled-over loans by treating them as new, current loans rather than placing them into default. (*Id*. at 88-91.) "In doing so, the Company effectively wiped out the negative credit history associated with borrowers who had a demonstrated inability to repay their loans." (*Id*. ¶ 88.) DFC Global's policy of treating rolled over loans as new loans with no additional risk came directly from senior management. (*Id*. ¶ 89.) Following the OFT's increased regulatory scrutiny, DFC Global had to increase its loan loss reserves as its borrowers increasingly defaulted. (*Id*. ¶ 92.)

### C.    The OFT Report

Following its investigation, the OFT reported that the U.K. payday lending industry was rife with irresponsible lending practices, including the failure to properly assess affordability. (*Id*. ¶ 96.) "The OFT report revealed exactly the types of practices that DFC Global had been engaged in throughout the Class Period. In fact, each of DFC Global's subsidiaries operating in the U.K. received letters from the OFT identifying deficiencies in operations." (*Id*. ¶ 98.) DFC Global was warned that if changes were not implemented within ninety days, DFC Global's business units that provided payday loans in the United Kingdom would be shut down. (*Id*. ¶ 98.)

Despite statements to the contrary from Weiss, the company failed to comply with lending regulations, and "the governing bodies . . . had grave doubts that DFC Global could ever become

compliant in light of its business practices." (*Id.* ¶¶ 100-01.) For example, a confidential witness stated that the company "never got in compliance with the OFT's regulations, despite the Company's purported assurance to the contrary." (*Id.* ¶ 101.) The same confidential witness claimed that DFC Global rolled over loans more than three times, even though the company assured others that it was in compliance with the rollover rule that disallowed so many rollovers. (*Id.* ¶ 102.)

### D.    False Statements

Plaintiffs allege that "[t]hroughout the Class Period . . . [D]efendants regularly made statements about DFC Global's 'conservative approach' to underwriting, distinguishing the company from its competitors as a 'responsible' lender, and reassured investors that its approach to extending credit was designed to 'get the money back.'" (*Id.* ¶ 106.) For instance, during a January 27, 2011 conference call, Weiss stated that, "[t]he implementation of what we believe to be industry leading proprietary credit scoring model and our continued conservative approach to extending consumer credit in the midst of a still-weakened economy resulted in a loan loss provision expressed as a percentage of gross consumer lender revenue of 16.6%." (*Id.* ¶ 107.) During a June 7, 2011 conference, Weiss stated, "We have, we think, the best analytics, underwriting and collection metrics in the industry." (*Id.* ¶ 108.) Underwood stated that DFC Global "undertook a conscious effort to . . . become more selective in the loans we put out, not knowing exactly where the recession was going, probably less money on the table, and we're pretty certain of that, but we feel a lot better about things having a very conservative approach during the recession until we saw what was going to ultimately happen." (*Id.* ¶¶ 108-09.)

During a January 26, 2012 conference call to discuss the company's second quarter 2012 results, Weiss stated:

> Well, first we like to get the money back, not only to give it out. So that's always our most important consideration. But I think it's a combination of really many years of investment in credit analytics and the really superior work of our credit analytics group, which encompasses not only underwriting, but the ability to stratify our borrowers and make sure collections are effective. Secondly, our decade of experience in storefront lending has provided us with a base of knowledge and experience that I think is relatively unique in this space.
>
> * * *
>
> We can underwrite to the ninth decimal point a customer's ability to repay. We're getting better at underwriting a customer's willingness to repay.

(*Id*. ¶ 111.) On January 24, 2013, Weiss praised the company's ability to keep its second quarter 2013 losses lower than expected:

> First we are more selective. Again, repeating what I said, no trick in giving the money out. I think we are more selective particularly in the UK, given the regulatory issues that we have discussed. I think we continue to improve in our ability to figure out how much to lend and to whom and how to collect from people who have difficulty making a full or partial repayment on time. But I think it's part and parcel of our considered stance to the environment in the UK.

(*Id*. ¶ 114.) Weiss assured analysts that further regulation of the industry would be helpful to DFC Global:

> What we have discovered is regulation is the friend of the responsible. . . . We think that we are on the road to [a] situation in the UK where lots of small lenders who simply lack the infrastructure or inclination to build the appropriate credit analytics and responsible collection apparatus will no longer be able to participate in the marketplace because relevant authorities will simply prevent it.

(*Id*. ¶ 115.) Plaintiffs contend that these statements were false, as DFC Global was neither conservative nor selective. Rather, it did not adhere to even minimal underwriting standards and instead targeted individuals unlikely to pay back their loans. (*Id*. ¶ 116.) The failure to disclose DFC

8

Global's shortcomings meant that "investors were misled about the Company's true lending practices and the creditworthiness of the Company's loans." (*Id*. ¶ 117.)

DFC Global's SEC filings contained numerous false and misleading statements regarding its purportedly effective credit analytics, risk management and related financial results. DFC Global's second quarter 2011 Form 10-Q (repeated in numerous other SEC filings) stated:

> The Company has instituted control mechanisms and a credit analytics function that have been very effective in managing risk in its consumer loan activities. Collection activities are also an important aspect of the Company's operations, particularly with respect to its consumer loan products due to the relatively high incidence of unpaid balances beyond stated terms. The Company operates centralized collection centers to coordinate a consistent approach to customer service and collections in each of its markets. The Company's risk control mechanisms include, among others, the daily monitoring of initial return rates with respect to payments made on its consumer loan portfolio.

(*Id*. ¶¶ 118-19.) During an April 30, 2012 conference call discussing the company's third quarter 2012 fiscal results, Underwood said:

> [O]ur vast investment in credit analytics folks, and we have them in several of our business units, as well as corporately, I think certainly has paid off for us many, many times over. And it not only helps out on the front end but it certainly helps out on the back end as we prioritize how to go about collection activities. So, I think we're happy being what we think is pretty conservative. It very well could be that we'd be leaving money on the table [by lowering underwriting standards] . . . But we think our performance is just fine with being as cautious as we are[.]

(*Id*. ¶ 125.) In SEC filings, the company also touted its centralized facilities, which "have helped us both to improve our loan servicing significantly and to reduce credit losses on loans originated by us, and significantly enhances our ability to manage the compliance responsibilities related to our consumer lending operations." (*Id*. ¶ 126.)  In reality, and contrary to these numerous false and

9

misleading statements, DFC Global's deficient lending and credit assessment practices increased the company's credit risk and related losses. (*Id*. ¶ 129.) The company also made misrepresentations about monitoring loans and "being in the forefront of government and community relations on regulatory issues." (*Id*. ¶¶ 130-33.)

Additionally, DFC Global made false statements about the payment status of loans, as well as its loan loss reserves. The company failed to properly report the actual payment status for loans that it rolled over by categorizing such loans as extended or current, when the loans were essentially past due. (*Id*. ¶¶ 135-36.) "By categorizing rolled over or extended loans as current, the Company avoided classifying them as past due and disclosing the true attendant credit risks and losses." (*Id*. ¶ 136.) DFC Global also failed to inform investors that it performed almost no underwriting when the loans were first originated or when they were subsequently rolled over. (*Id*. ¶ 139.) "The Company's loss reserve policy . . . and its reported net income, loan loss provision, and loan loss reserve . . . were each false and misleading because when calculating its loan loss reserve, the Company did not take into account the increased credit risk of its loans due to its deficient underwriting; the increased credit risk of continuously rolling over loans without conducting additional underwriting; or the true past due nature of the rolled over loans." (*Id*. ¶ 142.) These practices led DFC Global to understate its loan loss reserve and to overstate its net income. (*Id*. ¶¶ 142-43.)

### E.   **Performance Issues**

On April 1, 2013, DFC Global preannounced its third fiscal quarter 2013 results in a press release filed with the SEC and a conference call. (*Id*. ¶ 151.) The company reported that its consolidated loan loss provision as a percentage of gross consumer lending revenue was expected

to spike. (*Id.*) This spike impacted the company's reported net income, which declined. (*Id.*) DFC Global also reported that it was cutting its earnings per share by nearly 30%. (*Id.* ¶ 152.) On April 1, 2013, DFC Global's stock price fell from $16.64 to $13.04. (*Id.*) Despite these performance issues, Weiss and Underwood continued to tout the company as a responsible lender that maintained conservative underwriting practices. (*Id.* ¶¶ 153-54.) Weiss stated that DFC Global remained confident that it was well positioned for the long term "as irresponsible lenders are eventually targeted by the OFT and removed from the UK market." (*Id.* ¶ 153.) When the company announced its third fiscal quarter results on May 1, 2013, its consolidated loan loss provision as a percentage of gross consumer lending spiked more than previously anticipated. (*Id.* ¶ 156.) DFC Global also confirmed that the company's three business units in the United Kingdom that provided payday and single payment loans received "action required" letters from the OFT regarding their improper lending practices in a number of areas. (*Id.* ¶ 157.) Weiss discounted this news as a "bump in the road" and Underwood "continued to misleadingly describe the Company's lending practices during the regulatory transition period as responsible." (*Id.* ¶ 158.) When DFC Global reported its fiscal year 2013 earnings, it announced that defaulting loans would continue to be a problem through at least the first half of fiscal year 2014. (*Id.* ¶ 160.) Underwood also announced that DFC Global expected to incur $10-$15 million in expenses every year for regulatory, legal, audit, and compliance-related costs. (*Id.* ¶ 161.) This news sent the company's stock down from a close of $15.90 on August 22 to $11.31 on August 23. (*Id.*)

On October 30, 2013, DFC announced that as a result of higher loan defaults in the United Kingdom, its loan loss provision had increased. (*Id.* ¶ 163.) Weiss also explained that DFC Global instituted a number of restrictive changes to assure investors that the company maintained a

11

conservative regulatory posture. (*Id*.) Underwood reported that poor performance was the result of confusion about regulatory requirements; he also stated that he believed the stock was a bargain. (*Id*. ¶ 164.)

DFC Global's loan losses caused it to experience liquidity problems. (*Id*. ¶ 166.) These liquidity problems led the company to announce a private offering of senior notes to institutional investors. (*Id*.) The company was forced to withdraw the offering just a few days later, however, because "it could not draw sufficient investor interest in its debt." (*Id*.) This withdrawal caused a drop in the price of DFC Global stock. (*Id*.) Moreover, the company's consolidated loan loss provision continued to increase. (*Id*. ¶ 167.) The price of the stock continued to decline: on January 31, 2014, the price decreased from $10.57 to $7.52. (*Id*. ¶ 168.) "Defendants falsely blamed the Company's poor financial results on the fact that regulatory guidance in the U.K. was not yet definitive and that its competitors were engaging in lending practices that DFC Global had stopped." (*Id*. ¶ 169.) On February 3, 2014, Norm Miller, DFC Global's President and COO, resigned. (*Id*. ¶ 170.) On February 4, 2014, the price of the stock fell further, from $7.09 to $6.76. (*Id*.)

On April 1, 2014, the Financial Conduct Authority ("FCA") took control over payday lending in the United Kingdom (*Id*. ¶ 173.) On April 2, 2014, DFC Global announced that it had entered into an agreement with Lone Star Funds, a private equity company, to take DFC Global private. (*Id*.) Pursuant to the agreement, DFC Global shareholders were slated to receive $9.50 in cash per share of common stock. (*Id*.) Shareholders approved the merger on June 6, 2014, which was viewed as "the Company's only viable escape route, given the Company's apparent inability to operate under the new regulations." (*Id*. ¶¶ 177-78.) On June 13, 2014, DFC Global announced that its acquisition by Lone Star Funds had been completed. (*Id*. ¶ 179.) On July 1, 2014, the FCA's new regulations

went into effect. (*Id*. ¶ 180.)

### F.    Plaintiffs' Claims

Plaintiffs filed a class action lawsuit on behalf of all persons who purchased shares of DFC Global common stock during the class period, specifically between January 28, 2011 and February 3, 2014. Plaintiffs seek relief under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, alleging that DFC Global and the Executive Defendants carried out a scheme to deceive the investing public through false statements and material omissions. (*Id*. ¶¶ 224-232.) They also seek relief under § 20(a) of the Securities Exchange Act of 1934, alleging controlling person liability against Weiss, Underwood, and Athas.

Plaintiffs also bring claims pursuant to the Securities Act of 1933. Plaintiffs state that these are strict liability and negligence claims that "do not allege, and do not sound in, fraud." (*Id*. ¶ 239.) With respect to these claims, Plaintiffs allege that on April 7, 2011, DFC Global conducted a public offering of six million shares of common stock at $20.75 per share. (*Id*. ¶ 241.) This offering generated $130.2 million in gross proceeds for DFC Global; Arkansas Teacher Retirement System purchased 28,500 shares in the offering. (*Id*. ¶¶ 241-42.) The offering was conducted pursuant to a registration statement filed with the SEC and signed by Weiss and Underwood. (*Id*. ¶ 243.) DFC Global issued a prospectus, which it later supplemented. The offering materials contained materially untrue and misleading statements and omissions about DFC Global's effective credit analytics and risk management, the payment status of the company's payday loans, its financial results, and its internal results. (*Id*. ¶ 244-260.)

Plaintiffs' third claim for relief is brought pursuant to § 11 of the Securities Act of 1933 against all Defendants based on the false and misleading statements made in materials published for

the offering. (*Id*. ¶¶ 261-71.) The fourth and fifth claims for relief are brought pursuant to § 12(a)(2) and § 15 of the Securities Act of 1933, respectively. (*Id*. ¶¶ 272-85.)

## II.     STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a class action may be maintained only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to the requirements of Rule 23(a), a court must consider Rule 23(b), which allows for a class action to be maintained "if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Prior to certifying a class, the district court must perform a rigorous analysis as to whether the prerequisites of Rule 23 have been met. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015). This rigorous analysis requires that the district court resolve factual or legal disputes relevant to class certification, even if those disputes touch on the merits of the case. *Id*. The court must make factual determinations supporting its Rule 23 findings by a preponderance of the evidence. *Id*. at 484-85.

14

III.     **DISCUSSION**

A.      **Rule 23(a)**

1.     *Numerosity*

"Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir. 2001). While there is no precise number of putative class members that will ensure the numerosity requirement is met, a potential class exceeding forty members is generally considered sufficient. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001); *see also Serventi v. Bucks Tech. High Sch.*, 225 F.R.D. 159, 165 (E.D. Pa. 2004) (finding that the settlement class, which contained at least forty-seven potential members, met the numerosity requirement); *Godshall v. The Franklin Mint Co.*, Civ. A. No. 01–6539, 2004 WL 2745890, at *2 (E.D. Pa. Dec.1, 2004) (finding that the proposed class, which consisted of 112 members, was "sufficiently large that joinder of all members would impracticable").

Defendants do not contest—and the Court readily concludes—that the numerosity requirement is met. DFC Global's stock traded on the NASDAQ, and as Plaintiffs note, there were millions of shares of stock outstanding. The exact size of the proposed class is currently unknown, but it certainly meets the numerosity requirement. *See In re Vicuron Pharm., Inc. Sec. Litig.*, 233 F.R.D. 421, 425 (E.D. Pa. 2006) ("During the proposed class period, Vicuron stock was listed and traded on the NASDAQ. Hundreds, if not thousands, of investors traded in Vicuron stock during that time. At a minimum, it is clear that the proposed class is very large and that its members could not be realistically joined in one action. Therefore, plaintiffs have satisfied the numerosity requirement.").

2.      *Commonality*

A putative class satisfies the commonality requirement if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes*, 802 F.3d at 486. The bar to satisfy the commonality requirement is not high: a single common question is sufficient. *Id*. Defendants do not dispute that Plaintiffs have satisfied the commonality requirement, and the Court finds that Plaintiffs have met this requirement. Courts have noted that the commonality requirement is readily satisfied in securities fraud cases. *See, e.g.*, *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 296 (D. Del. 2003) ("[T]he commonality requirement has been permissively applied in the context of securities fraud class actions."). There are a number of common questions of law or fact, including whether Defendants violated the securities law, whether Defendants made false statements or omitted material statements, and whether Defendants acted with the requisite mental state. Thus, the commonality requirement is satisfied.

3.      *Typicality*

Typicality examines "whether the named plaintiff's individual circumstances are markedly different [from those of unnamed class members] or . . . the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985); *see also Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994). When considering typicality, courts should determine whether the class meets the following requirements: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and

(3) the interests and incentives of the representative must be sufficiently aligned with those of the class. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012). Typicality does not require that putative class members share identical claims. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531–32 (3d Cir. 2004). Instead, "[t]he heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1984). If a plaintiff's claim arises from the same event, practice, or course of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992).

According to Defendants, Plaintiffs cannot meet the typicality requirement because the Arkansas Teacher Retirement System was an in-and-out trade of DFC Global stock during the class period. (DFC Defs.' Mem. of Law in Opp'n to Lead Pls.' Mot. for Class Certification [Defs.' Opp'n] at 12-13; DFC Defs.' Suppl. Br. in Further Opp'n to Class Cert. Noting Recent Authority and Addressing New Issues Raised by Lead Pls. in Their Reply Br. [Defs.' Apr. 26, 2016 Br.] at 5-7.) Plaintiffs counter that the Arkansas Teacher Retirement System is not an in-and-out-trader and that it is not subject to unique defenses. (Lead Pls.' Reply Br. in Supp. of Their Mot. for Class Cert. [Pls.' Mar. 24, 2016 Reply] at 8-10; Lead Pls.' Br. in Resp. to the DFC Defs.' Suppl. Br. Filed Apr. 27, 2016 [Pls.' May 4, 2016 Reply] at 10-14.)

Courts have expressed misgivings about allowing in-and-out traders to represent a class because such traders may not be able to demonstrate loss causation. If an investor purchased and sold shares of stock prior to any corrective disclosure, how could that investor show that its loss was caused by a misrepresentation or omission that, when uncovered, negatively affected the value of

the stock? *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009). Indeed, a number of courts have decided that a class represented by in-and-out-traders should not be certified because those representatives were subject to unique defenses that could become the focus of the litigation. *See, e.g.*, *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, Civ. A. No. 11-4209, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, Civ. A. No. 11-7533, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013) ("As in-and-out traders, the named plaintiffs again subject themselves to unique inquiries regarding their trading patterns and why they made investment decisions, whether the fraud was in fact irrelevant to their purchasing and sale decisions, and whether on individual trades they profited. These inquiries will also require considerable time and resources and indeed threaten to become the focus of the litigation.").

Other courts, however, have allowed in-and-out traders to be included in a securities class. *See, e.g.*, *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) ("[D]efendants argue that USS is atypical in that it alternated between purchases and sales throughout the class period. But such 'in-and-out' trading is not atypical in a class that contains, by defendants' own admission, numerous sophisticated institutional investors."); *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 698-99 (W.D. Wash. 2010).

If the Arkansas Teacher Retirement System had purchased and sold all of its DFC Global shares prior to any corrective disclosure, Plaintiffs would have a problem. However, it is undisputed that it did not. Rather, the Arkansas Teacher Retirement System retained a considerable number of shares following the alleged corrective disclosures. (Lead Pls.' Mot. for Class Cert. Ex. 9.) Without question, the Arkansas Teacher Retirement System held onto a significant number of shares throughout the class period and has presented evidence that it suffered losses following the corrective

18

disclosures. The Court concludes that Plaintiffs have satisfied the typicality requirement by a preponderance of the evidence.

### 4.    *Adequacy of representation*

A court cannot certify a class unless it is satisfied that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement touches on whether the interests of the class representatives conflict with the interests of class members and whether class counsel is able to adequately represent the class. *Newton*, 259 F.3d at 185.

### a.    *Who is running the show?*

Defendants argue that the class representatives are not adequate because this litigation is being directed by class counsel, who are pulling the strings of the puppet Plaintiffs. Defendants argue that "Plaintiffs have done nothing to direct the litigation," and have failed to enact any procedures for overseeing the progress of the litigation or communicating among themselves. (Defs.' Opp'n at 9.) Defendants have accused Plaintiffs of misleading the Court when they sought appointment as Lead Plaintiffs. (*Id.*)

In seeking to be appointed Lead Plaintiff, they promised to accept "the fiduciary obligations it will assume if appointed Lead Plaintiff in this action." (Mem. of Law in Supp. of the Mot. of the Institutional Investor Grp. for Appointment As Lead Pl. and Approval of Its Selection of Lead Counsel at 10.) It further affirmed "its understanding of the duties owed to Class members through its commitment to oversee and monitor the prosecution of this action in the best interests of the Class." (*Id.*) To carry out these commitments, the members of the Institutional Investor Group conducted a joint conference call during which the group "discussed the merits of the action, the benefits of working together jointly to prosecute the litigation, as well as the procedures and

19

mechanisms . . . to ensure that the Class will benefit from [their] supervision of counsel." (Decl. of Jeffrey Golan in Supp. of Lead Pls.' Mot. for Class Cert. Ex. 2 [Joint Decl. in Supp. of Mot. of the Institutional Investor Grp. for Appointment as Lead Pl.] ¶ 7.) Moreover, the group "established procedures for overseeing the progress of the litigation and communicating regularly among [themselves] and with counsel." (*Id*.), The Court found that the Institutional Investor Group, having sworn to remain committed to prosecuting this litigation, would be able to fairly and adequately protect the interests of the Class. *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, Civ. A. No. 13-6731, 2014 WL 1395059, at *8-9 (E.D. Pa. Apr. 10, 2014). The Court also found that "[t]he members of the Institutional Investors Group are sophisticated entities that to date have demonstrated an ability and willingness to forcefully advocate for the class. Moreover, the Institutional Investor Group has selected counsel well versed in this area and able to devote the resources to this litigation. The Court also concludes that there are no conflicts that render the Institutional Investor Group unable to fulfill its obligations as lead plaintiff." *Id*. at *9.

Relying on deposition testimony, Defendants claim that Lead Plaintiffs have failed to keep their word. They complain that there has been no communication among Plaintiffs regarding this litigation, nor have Lead Plaintiffs enacted procedures to further this litigation. (Defs.' Opp'n at 11.) Unsurprisingly, Plaintiffs dispute Defendants' take on Plaintiffs' participation—or lack thereof—in this litigation. (Pls.' Mar. 24, 2016 Reply at 4-8.)

Would it be advantageous for Lead Plaintiffs to communicate more frequently? Likely. To date, however, no deadlines have been missed, no discovery has gone unanswered, and no motion has gone unfiled or response unaddressed. Plaintiffs have testified that they have communicated with their lawyers, reviewed filings prior to their submission to the Court, and have aided counsel in

responding to discovery requests. Moreover, Plaintiffs' representatives who have testified to date have shown a basic understanding of the facts and claims underlying this litigation. That is all that is required. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 430 (3d Cir. 2016) (noting that "a minimal degree of knowledge about the litigation is adequate"); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) ("A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.").

There are no conflicts that would render Lead Plaintiffs unable to protect the interests of the class. There is also nothing in the record that would lead this Court to conclude that counsel is unable to adequately represent the class. Accordingly, the Court finds that Plaintiffs have demonstrated that the adequacy of representation requirement has been satisfied here.

### b.    Standing

Defendants argue that the Arkansas Teacher Retirement System is an inadequate class representative because it lacks standing to bring claims pursuant to §§ 11 and 12(a)(2) of the Securities Act of 1933 on behalf of those who purchased shares in the April 7, 2011 stock offering. (Defs.' Opp'n at 14-15.)

Section 11 of the Securities Act of 1933 creates a claim based on false statements made in registration statements. It reads:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue.

15 U.S.C. § 77k(a). Both §§ 11 and 12 claims may only be brought by purchasers and sellers of securities. *See In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 274 (S.D. Tex. 2005). Plaintiffs have submitted evidence that the Arkansas Teacher Retirement System purchased thousands of shares of DFC Global stock the day after the April 7, 2011 offering, at the offering price, and from one of the Defendants who underwrote the offering. Moreover, deposition testimony confirmed that the purchase was made on behalf of the Arkansas Teacher Retirement System in the April 2011 public offering. (Pls.' Mot. for Class Cert. Ex. 10 [Hasso Dep.] at 99.) The Court deems this evidence sufficient to demonstrate standing. *See In re Dynegy*, 226 F.R.D. at 274; *see also Smith v. Suprema Specialities, Inc.*, Civ. A. No. 02-168, 2007 WL 1217980, at *6 (D.N.J. Apr. 23, 2007).

### B.      Rule 23(b)(3) Predominance

In addition to satisfying the requirements of Rule 23(a), the Court cannot certify a class unless it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry encompasses "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action." *Id*. Because the predominance test examines whether common issues of law or fact predominate over non-common, individualized issues of law or fact, the mere presence of individual legal or factual questions does not foreclose a finding of predominance. *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 370-71 (3d Cir. 2015).

Defendants cite two reasons that Plaintiffs cannot satisfy the predominance requirement. First, "Plaintiffs cannot establish class-wide reliance . . . because they have failed to prove that the market for DFC's stock was efficient during the Class Period." (Defs.' Opp'n at 15.) Second, "Plaintiffs have proffered *no* damages model showing that damages can be measured on a class-wide basis, consistent with their theory of liability." (*Id*.)

### 1.    Reliance

To answer the predominance question, courts should begin with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). To state a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

The Court will focus on the reliance requirement. In a securities fraud case, if individual issues of reliance predominate, class certification is unsuitable. *See Malack v. BDO Seidman, LLP*, 617 F.3d 743, 746-47 (3d Cir. 2010) ("Proving reliance for individual class members can quickly become a cumbersome endeavor that overwhelms the questions of law or fact common to the proposed class, and could preclude class certification."). However, "[r]eliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." *Newton*, 259 F.3d at 175. This presumption of reliance is based on the fraud-on-the-market theory, which posits that in an open and developed securities market, the price of a company's stock is determined by the available material information about the company and its business. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42, 246 (1988) ("[T]he market price of shares traded on

23

well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."). Thus, misleading statements will defraud stock purchasers even if the purchasers did not directly rely on the misleading statements. *Id*. As the Supreme Court has stated, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."*Id*. at 247.

To establish a presumption of reliance based on the fraud-on-the-market theory, a plaintiff must show that: (1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014). A defendant can rebut this presumption through any showing that severs the link between the alleged misrepresentation and either the price paid by the plaintiff, or the decision to trade at a fair market price. *Id*.; *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016) ("*Halliburton II* held that defendants may submit price impact evidence prior to class certification for the purpose of rebutting the *Basic* presumption."). The battle here relates to whether DFC Global stock traded in an efficient market. "[A] market is efficient when the prices of securities incorporate most public information such that they respond reasonably promptly to new material information." *Strougo*, 312 F.R.D. at 314-15.

Plaintiffs suggest that because DFC Global stock was traded on the NASDAQ, the Court should presume an efficient market. (Pls.' Mar. 24, 2016 Reply at 13-14.) The NASDAQ is "one of

the two largest stock exchanges in the United States, the largest electronic-equity securities trading market in the United States, and one of the largest stock exchanges in the world." *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012). Indeed, the Third Circuit Court of Appeals has referred to the NASDAQ as "open and developed" and therefore "well suited for application of the fraud on the market theory." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011). Some courts have concluded that being listed on a major exchange is sufficient for a plaintiff to demonstrate market efficiency. *See, e.g., In re Merck & Co. Sec., Derivative & ERISA Litig.*, MDL No. 1658, 2013 WL 396117, at *11 (D.N.J.  Jan. 30, 2013) ("This case involves the common stock of a company which not only trades on a major and efficient exchange, but in fact is a component of the Dow Jones 30 Industrial Average. These facts more than suffice to meet Plaintiffs' burden on this motion of demonstrating market efficiency."); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 559 n.6 (W.D. Pa. 2006). A number of courts have concluded that—even if a presumption of efficiency is unwarranted—the listing of a stock on a major exchange like the NASDAQ weighs in favor of finding market efficiency. *See, e.g., In re DVI, Inc. Sec. Litig.*, 639 F.3d at 634 ("Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013) ("[T]he Court concludes that the trading of First Solar stock on NASDAQ—a major, well-developed stock exchange—weighs in favor of finding market efficiency."); *Lumen*, 295 F.R.D. at 459 ("It would be remarkable for a court to conclude NASDAQ is not an efficient market—which is why securities traded on NASDAQ are often presumed to be traded on an efficient market."); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) ("In this case, Plaintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because

Plaintiffs sufficiently established that Juniper's stock was actively traded on an efficient market—the NASDAQ."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 (D. Mass. 2006) (concluding that an efficiency presumption for stocks traded on a national exchange was not appropriate, but highlighting the importance of being listed on a national exchange in the efficiency analysis).

Courts that must determine whether a market is efficient have turned to the factors laid out in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). The *Cammer* factors are: (1) the company's average weekly trading volume; (2) the number of analysts who follow the stock; (3) the existence of market  makers and arbitrageurs; (4) the ability of the company to file a Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price. *Id*. at 1286-87.

In support of their motion for class certification, Plaintiffs have provided the Court with the expert report of Michael L. Hartzmark, Ph.D., President of Hartzmark Economics Litigation Practice, LLC, which is a firm that specializes in the application of economics and finance to legal, commercial, and regulatory issues. (Pls.' Mot. for Class Cert. Ex. 5 [Hartzmark Report] ¶ 4.) Hartzmark's ultimate opinion is that "throughout the Class Period, DFC common stock traded in an open, well-developed and efficient market." (*Id*. ¶ 10.) His opinion analyzes the *Cammer* factors. With respect to those factors, Defendants' attack on Dr. Hartzmark's opinion focuses on the fifth factor, the cause and effect relationship. The Court finds that the first four *Cammer* factors favor a finding of market efficiency and the Court will therefore turn to the fifth factor. (*See* Pls.' Mot. for Class Cert. Ex. 13 [*Cammer* factors summary]; *see also* Mem. of Law in Supp. of Lead Pls.' Mot.

for Class Cert. [Pls. Mem.] at 18-20.)

Defendant, relying on a quote from the Third Circuit Court of Appeals, argues that the cause-and-effect factor is the most important of the *Cammer* factors. (Defs.' Opp'n at 17 (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 634 ("However, because an efficient market is one in which information important to reasonable investors . . . is immediately incorporated into stock prices, the cause-and-effect relationship between a company's material disclosures and the security price is normally the most important factor in an efficiency analysis.")).) The Court understands the import of Defendants' argument to be that if Plaintiffs fail to persuade the Court that there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price, Plaintiffs will have failed to demonstrate market efficiency. That, however, may not be the case. Courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency. *See, e.g.*, *Strougo*, 312 F.R.D. at 320-21 ("[T]here would be no need for a five factor test . . . if one factor were dispositive in every context. Not surprisingly, no court has adopted a per se rule that any one *Cammer* factor is dispositive."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83-84 (S.D.N.Y. 2015); *Forsta AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 520 (D. Minn. 2015).

Regardless, the Court concludes that Plaintiffs have established the fifth *Cammer* factor by a preponderance of the evidence. To address the fifth *Cammer* factor, Dr. Hartzmark employed an event study. (Hartzmark Report ¶ 34.) An event study "is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010). As described by Dr. Hartzmark:

To perform an event study, one begins by separating the impact on security price

27

> movements of market- and industry-wide factors from firm-specific factors. This approach uses a so-called market model to partition a company's common stock price movement on each trading day into three parts: the movement caused by market-wide factors, or the 'market effect'; the movement caused by industry-wide factors, or the 'industry effect'; and the movement caused by the 'firm specific effect.' . . . [O]n each day the firm-specific effect is obtained by subtracting the stock price movement that is *predicted* for that day . . . from the *actual* stock price movement on that same day. This subtraction yields the 'abnormal result' for that day, and represents the portion of the return that is not predicted by market- and industry-wide factors.

(Hartzmark Report ¶ 35.)

Defendants' expert, Dr. David Marcus, counters that "Dr. Hartzmark's event study methodology is insufficient to establish the existence of a cause-and-effect relationship between DFC Global's stock price and new, value-relevant information throughout the entire Proposed Class Period and thus does not prove that the market in which DFC Global's common stock traded during the Proposed Class Period was efficient." (Defs.' Opp'n Ex. 1 [Marcus Report] ¶ 6.)

Dr. Marcus states that "[i]f a cause-and-effect relationship is not present, then the market for that security is not efficient." (Marcus Report ¶ 21.) He continues: "[i]f an event study does not reveal sufficient evidence of a cause-and-effect relationship throughout the relevant period, one cannot reliably conclude that a market was efficient during that period, even if the other *Cammer* factors indicate that the market was open and developed." (*Id.*)

Whatever the economic import of these statements may be, this rigid viewpoint fails to comport with the legal landscape of market efficiency. As noted previously, some courts have not performed a *Cammer* analysis when the security was traded on a public exchange such as the NASDAQ. Other courts have performed the *Cammer* analysis, but have pointed out that the absence of a cause-and-effect relationship does not foreclose the possibility of an efficient-market finding.

Dr. Marcus also takes Dr. Hartzmark to task for performing an event study that failed to

actually test for market efficiency. (Marcus Report ¶ 27.) Dr. Marcus questions Dr. Hartzmark's methodology for testing marketing efficiency, noting that Dr. Hartzmark did not identify events that would be expected to have either a positive or negative effect on DFC Global's stock price in an efficient market, and then test whether or not the price moved as expected. (*Id*. ¶ 28.) Defendants' expert also argues that Dr. Hartzmark's peer index was not truly representative of DFC Global's industry, and thus failed to properly control for industry factors. (*Id*. ¶ 29.)

The Court concludes that Plaintiffs have the better of this battle of the experts. For one, Dr. Hartzmark's numbers are essentially unchallenged. While Defendants' strategy here appears to call into question Plaintiffs' expert's conclusions, Defendants have not tried to show that the market for DFC Global stock was inefficient. Moreover, without an attack on the underlying numbers, the Court ultimately concludes that the fifth *Cammer* factor points toward market efficiency. Dr. Hartzmark's report includes data to support the conclusion that abnormal returns were experienced  on dates that included corrective disclosures. Essentially, the experts are talking over each other, but Dr. Hartzmark has data underlying his conclusions and Dr. Marcus just has noise. Finally, the Court sees no problem with the peer index used by Dr. Hartzmark. DFC Global deemed as peers some of the companies included in Dr. Hartzmark's peer index. Moreover, Dr. Marcus did not develop an alternative peer index or even offer a suggestion as to what "peers" he would have added or eliminated from Dr. Hartzmark's peer index. Thus, this Court is left with a vague and unsubstantiated critique of the peer index.

The Court concludes that DFC Global traded on an efficient market, and that Plaintiffs are entitled to the presumption of reliance outlined in *Basic*.

2.      *Rebutting the* Basic *presumption*

A defendant can rebut the *Basic* presumption by providing direct evidence that demonstrates that the relevant corrective disclosures did not impact the security's price. *Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, Civ. A. No. 12-5275, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015). Because a defendant's burden of proving a lack of price impact is "daunting," simply "pointing to other potential causes for a stock price change following a corrective disclosure is therefore not enough to rebut the *Basic* presumption." *Id.*

To support their argument that they have rebutted the presumption of reliance, Defendants contend that the record evinces a lack of price impact stemming from the vast majority of the alleged misrepresentations. (Defs.' Opp'n at 20-21.) Specifically, Defendants point out that "Plaintiff's own expert . . . determined that a statistically positive price movement did ***not*** follow ***nineteen*** of the twenty days on which Plaintiffs claim DFC made materially misleading statements." (*Id.* at 20.)

Defendants have failed to rebut the *Basic* presumption with direct evidence. They did not include their own event study and instead have simply tried to attack Plaintiff's expert. *See Strougo*, 312 F.R.D. at 325. Furthermore, even accepting that the stock did not increase immediately following a misstatement, it does not "necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact." *Sterling Heights*, 2015 WL 5097883, at *12 n.8. Perhaps the misstatements aided in keeping the price of the stock artificially high. *See id.*; *see also Barclays*, 310 F.R.D. at 95. Regardless, Plaintiffs produced evidence of price impact upon the disclosure of the misrepresentations, and Defendants have failed to provide a valid reason to discount that evidence. Therefore, the Court concludes that Defendants have failed to overcome the *Basic* presumption.

3.    *Damages*

Defendants also charge that Plaintiffs cannot satisfy the predominance requirement because they cannot show that their alleged damages are measurable on a class-wide basis. (Defs.' Opp'n at 24.) To support this argument, Defendants rely on *Comcast v. Behrend*, 133 S. Ct. 1426 (2013). In *Comcast*, the Supreme Court concluded that the class was improperly certified because the model used to calculate damages failed to measure damages resulting from the particular antitrust injury that had served as the basis for the class's theory of liability. The Supreme Court decided that a damages model that did not even attempt to measure damages in accordance with the class's theory of liability "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id*. at 1433.

The problem with Defendants' argument is that the Third Circuit has addressed the import of the *Comcast* decision: "A close reading of [*Comcast*] makes it clear that the predominance analysis was specific to the antitrust claim at issue." *Neale*, 794 F.3d at 374. Subsequent to the decision in *Comcast*, it remains the law in the Third Circuit that the need to perform individual damages calculations does not foreclose class certification under Rule 23(b)(3). *Id*. at 374-75; *see also Sterling Heights*, 2015 WL 5097883, at *13 ("Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages. Indeed, in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be an abuse of discretion.").

Defendants are aware of the uphill battle their damages argument faces and make clear that they are preserving this argument on the applicability of *Comcast* to securities cases pending

Supreme Court review of a cert petition filed in a case in the Fifth Circuit. (*See* Defs.' Apr. 26, 2016 Br. at 10-11.) The Court appreciates Defendants' need to advocate this position, but holds that the current state of the law in the Third Circuit forecloses Defendants' position on damages.

## IV.    CONCLUSION

The parties have presented their arguments, and the Court has sifted through the filings, considered the arguments, and even learned some things about economics. To date, both sides have performed ably on behalf of their clients. Ultimately, the Court concludes that Plaintiffs have shown by a preponderance of the evidence that they have satisfied the requirements of Rule 23. Accordingly, Plaintiffs' motion for class certification is granted. An Order consistent with this Memorandum will be docketed separately.