# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST PALM BEACH | : | |
| POLICE PENSION FUND, | : | CIVIL ACTION |
| on behalf of itself and all others | : | |
| similarly situated, | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | |
| | : | |
| DFC GLOBAL CORP., et al., | : | No. 13-6731 |
|     Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                                             **September 20, 2017**

The parties in this complex securities fraud litigation involving the payday lending industry have reached a settlement. The parties have moved for final approval of the settlement and plan of allocation, as well as for an award of attorneys' fees and reimbursement of litigation expenses. For the reasons that follow, the motions for final approval and attorneys' fees and costs shall be granted.

## I.     BACKGROUND

### A.     Facts

DFC Global was a provider of alternative financial services, including unsecured short-term consumer loans, also known as payday loans. (Jt. Decl. of Golan and Rizio-Hamilton in Supp. of (1) Lead Pls.' Mot. for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Co-Lead Counsel's Mot. for an Award of Att'ys' Fees and Reimbursement of Litig. Expenses [Jt. Decl] ¶ 13.) Plaintiffs filed a class action lawsuit on behalf of all persons who purchased shares of DFC Global common stock during the class period, specifically between January 28, 2011 and February 3, 2014. Plaintiffs sought relief under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-

5, alleging that DFC Global and a number of DFC Global executives carried out a scheme to deceive the investing public through false statements and material omissions. Plaintiffs also sought relief under § 20(a) of the Securities Exchange Act of 1934, alleging controlling person liability against several executives. Finally, Plaintiffs brought claims pursuant to the Securities Act of 1933.

Plaintiffs contended that Defendants made materially false and misleading statements about DFC Global's true financial and operating condition and the nature of its lending practices in its U.K. payday lending operations, which caused the price of DFC Global common stock to be artificially inflated during the class period. Plaintiffs also claimed that investors were damaged when the truth was revealed and the price of the stock declined. (*Id*. ¶ 20.) The Complaint alleged that DFC Global and certain executives made a series of misstatements and omissions about DFC's short-term payday portfolio, as well as misstatements about the conservative and selective practices DFC Global employed. (*Id*. ¶ 21.) Relying on information from former employees, Plaintiffs claimed that DFC Global's lending practices "were far from conservative or prudent and that DFC routinely lent to borrowers without conducting any affordability checks." (*Id*. ¶ 22.) DFC Global permitted borrowers to roll over loans that the borrowers could not afford to repay, enriching DFC Global with fees. (*Id*. ¶ 23.) "The Complaint also alleged that DFC's loan loss reserves were understated as a result of its poor lending practices, its failure to adequately monitor the quality of its loans, and its failure to properly account for loans that were rolled over." (*Id*. ¶ 25.)

### B. History of the Litigation

On November 20, 2013, Plaintiffs filed a class action complaint in this Court. On April 9, 2014, following a round of briefing regarding which party should act as lead plaintiff and which law firm should act as lead counsel, this Court appointed as lead plaintiff the institutional investor group

comprised of West Palm Beach Police Pension Fund, the Arkansas Teachers Retirement System, the Macomb County Employees Retirement System, and the Laborers' District Council and Contractors' Pension Fund of Ohio. The Court also approved Lead Plaintiffs' selection of Barrack, Rodos & Bacine and Bernstein Litowitz Berger & Grossman LLP as co-lead counsel. On April 22, 2014, this litigation was consolidated with a related case filed in this District. Lead Plaintiffs filed a Consolidated Class Action Complaint on July 21, 2014.

Co-Lead Counsel performed significant due diligence prior to filing the Complaint. The attorneys reviewed SEC filings, reports by securities and financial analysts, transcripts of DFC Global's earnings conference calls and publicly available presentations of DFC Global, analyzed DFC Global's press releases and media reports, consulted with industry and regulatory consultants and accounting experts, and analyzed information obtained from confidential witnesses who had previously worked at DFC Global. (Jt. Decl. ¶ 18.)

On October 3, 2014, Defendants filed motions to dismiss the complaint, to which Plaintiffs responded on December 2, 2014. On June 16, 2015, the Court denied the motions to dismiss, and on August 3, 2015, Defendants filed their answers to the Consolidated Class Action Complaint. Discovery commenced in July 2015. (Jt. Decl. ¶ 33.) During discovery, counsel for the parties conducted a number of meet and confer sessions. (Jt. Decl. ¶ 34.) Ultimately, Defendants produced over 1.7 millions pages of documents, and Lead Plaintiffs produced thousands of pages of documents. (Jt. Decl. ¶ 36.) A total of thirteen depositions were taken, including six depositions of Lead Plaintiffs' representatives and financial advisors, two depositions of expert witnesses taken in connection with Lead Plaintiffs' motion for class certification, and five depositions of current and former employees of DFC Global. (Jt. Decl. ¶ 38.)

On October 2, 2015, Lead Plaintiffs filed a motion for class certification, to which Defendants responded on February 12, 2016. Some supplemental briefing on the motion followed, and on August 4, 2016, the Court granted the motion for class certification. The parties subsequently engaged in extensive settlement discussions and reached an agreement, which will be described in great detail below.

On March 8, 2017, the Court entered an order that preliminarily approved the settlement, approved the proposed notice to the class, and set procedures and deadlines to see the litigation to its conclusion, should the Court grant final approval of the settlement. (Jt. Decl. ¶ 60.)

### C. Settlement Terms

The Class consists of:

> All persons or entities who purchased or otherwise acquired common stock issued by DFC Global Corporation ("DFC Global") between January 28, 2011, and February 3, 2014, inclusive ("Class Period"), and were damaged thereby. Included within the Class are persons or entities who purchased shares of DFC Global stock on the open market and/or in a registered public offering on or about April 7, 2011. Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) any directors, officers, and partners of DFC Global or the Underwriter Defendants during the Class Period and members of their immediate families; (d) the subsidiaries, parents and affiliates of DFC Global and the Underwriter Defendants; (e) any firm, trust, corporation or other entity in which any Defendant has or had a controlling interest; and (f) the legal representatives, heirs, successors and assigns of any such excluded party.

Under the settlement agreement, members of the class have agreed to "fully, finally and forever compromise[], settle[], release[], resolve[], relinquish[], waive[] and discharge[]" all of their claims against Defendants. (Settlement Agreement ¶ 4.) In consideration for terminating the litigation and providing releases to Defendants, "the DFC Global Defendants shall pay"

4

$30,000,000.00 in cash into an escrow account. (*Id.* ¶ 7.) The cash shall be used to pay authorized claimants, any taxes owed, notice and administrative costs, litigation expenses authorized by the Court, and attorneys' fees awarded by the Court. (*Id.* ¶ 8.) The settlement agreement further included provisions for notice and settlement administration, "including but not limited to the process of receiving, reviewing and approving or denying Claims, under Lead Counsel's supervision and subject to the jurisdiction of the Court." (*Id.* ¶ 17.) A claims administrator was tasked with determining the validity of a claim and the pro rata share of the settlement fund based on the allocation plan proposed in the notice. (*Id.* ¶¶ 19, 23.)

## II. DISCUSSION

### A. Settlement

"The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Because the settlement would bind class members, this Court may only approve the settlement upon a finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "[T]he district court acts as a fiduciary who must serve as a guardian of the rights of absent class members . . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995). However, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975); *see also Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir. 1983). The law looks favorably upon class action settlements to conserve scarce judicial resources. *Gen. Motors*, 55 F.3d at 784. Indeed, a court may

5

apply an initial presumption of fairness to a class action settlement when the negotiations occurred at arm's length, the parties engaged in sufficient discovery, those advocating for the settlement were experienced in similar litigation, and only a small fraction of the class objected. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016).

The decision of whether a settlement is fair, reasonable, and adequate is guided by the nine-factor test enunciated in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975). The *Girsh* test directs the court to examine: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater settlement; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation. *Girsh*, 521 F.2d at 157. More recently, the Third Circuit Court of Appeals has expanded upon the *Girsh* factors to include several permissive and non-exhaustive factors: (1) the maturity of the underlying substantive issues; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; (4) whether class or subclass members are accorded the right to opt out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998).

*1. Presumption of fairness*

The Court concludes that a presumption of fairness is warranted here. The use of an independent mediator, which the parties employed here, is strong evidence of arm's length negotiations. *See Gates v. Rohm and Hass Co.*, 248 F.R.D. 434, 444 (E.D. Pa. 2008) (noting that the settlement was produced after "two full days of mediation before an experienced mediator"); *see also In re Flag Telecom Holdings, Ltd. Secs. Litig.*, Civ. A. No. 02-3400, 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010) ("The presumption in favor of the negotiated settlement in this case is strengthened by the fact that settlement was reached in an extended mediation supervised by Judge [Daniel] Weinstein.").

The parties engaged in arm's length negotiations. Counsel for the parties participated in two in-person mediation sessions with Daniel Weinstein, a former California superior court judge who has experience in mediating securities class actions. (Jt. Decl ¶ 48.) Prior to both of these sessions, the parties exchanged detailed mediation statements with numerous exhibits. (*Id*. ¶¶ 49, 52.) Although these in-person sessions did not bear fruit, the mediator continued to hold substantial discussions with the parties, including a conference call during which the parties' respective damages experts participated. (*Id*. ¶ 53.) Following these meetings and calls, the mediator issued a proposal that the litigation be settled for $30 million. (*Id*. ¶ 54.) The parties accepted the mediator's number and prepared the settlement agreement. (*Id*. ¶ 55.)

Moreover, this is far from the first rodeo for those advocating settlement. The lawyers involved here possess extensive litigation experience, which tilts the scales in favor of approving the settlement.

2. *Complexity, expense, and likely duration of the litigation*

The first *Girsh* factor looks at the time and money likely necessary if the litigation continued. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 320 (3d Cir. 2011). Securities fraud litigation is "inherently complicated." *See In re Viropharma Inc. Secs. Litig.*, Civ. A. No. 12-2714, 2016 WL 312108, at *9 (E.D. Pa. Jan. 25, 2016)

Although the parties had already performed a great deal of work, there remained a great deal to do. If not for the settlement, the parties would have to complete fact discovery, engage in expert discovery, brief the inevitable summary judgment motion, and then, if necessary, prepare for trial, including preparing proposed jury instructions and motions in limine. The Court also suspects that regardless of the outcome of the trial, post-trial motions and an appeal, would follow.

Securities litigation is notoriously complicated and it is certainly not conducted on the cheap. Because there is an excellent chance that this litigation would be costly, complicated, and proceed for years into the future, the Court finds that this factor weighs heavily in favor of approving the settlement.

3. *Reaction of the class to the settlement*

Based upon the number of objectors and their arguments, does the class support the settlement? *Prudential*, 148 F.3d at 318. Silence from the class generally indicates agreement, although "the practical realities of class actions ha[ve] led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *Gen. Motors*, 55 F.3d at 812.

A notice packet was mailed to over 22,800 potential class members. To date, not a single objection was raised. (Reply Mem. of Law in Further Supp. of Lead Pls.' Mot. for Final Approval

of Settlement and Plan of Allocation; and Co-Lead Counsel's Mot. for an Award of Att'ys' Fees and Reimbursement of Litig. Expenses at 1-2.) Moreover, only one request for exclusion was received. (*Id*. at 3.) There are a number of institutional investors that would have an incentive to object if troubled by the terms of the deal. Therefore, this response (or rather, lack thereof), weighs in favor of approving the settlement.

### 4. *Stage of the proceedings and the amount of discovery completed*

The third *Girsh* factor considers the current stage of the proceedings and the lawyers' knowledge of the strengths and weaknesses of their case. "Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Gen. Motors*, 55 F.3d at 813; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("This factor captures the degree of case development that class counsel have accomplished prior to settlement.").

Counsel has had ample time and information to learn the strengths and weaknesses of the case. Prior to filing a complaint, class counsel conducted a significant amount of due diligence, including interviews of former DFC Global employees, analysis of SEC filings, and review of publicly available information. Following some initial motion practice, counsel obtained substantial discovery that further allowed them to learn their case and process the pros and cons of settlement. Depositions, document review, and further briefing ensued and allowed for refinement of arguments and litigation positions.

The Court is convinced that this factor weighs heavily in favor of approving the settlement.

### 5. *Risks of establishing liability and damages*

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance

the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Nat'l Football League*, 821 F.3d at 439. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814. The more risks that Plaintiffs may face during litigation, the stronger this factor favors approving a settlement. *See Prudential*, 148 F.3d at 319. In examining this factor, the court may "give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997).

As is to be expected in a complex securities case, Defendants had counter arguments for everything Plaintiffs threw their way. For instance, and as noted in this Court's Memorandum addressing Defendants' motions to dismiss, Defendants offered a plethora of reasons for the Court to dismiss Plaintiffs' claims. Defendants argued that: (1) Plaintiffs failed to allege a misstatement or omission of material fact that was false or misleading when made; (2) most of the allegedly fraudulent statements were non-actionable statements of belief or opinion, forward-looking statements protected by the Private Securities Litigation Reform Act's safe harbor, or statements of puffery; (3) Plaintiffs failed to plead scienter properly; (4) Plaintiffs failed to plead loss causation properly; and (5) the statute of limitations had expired on certain claims.

Plaintiffs faced significant hurdles demonstrating the falseness of Defendants' statements. Defendants would have argued that statements about the conservative nature of their lending practice were true and that such statements were also not subject to legal liability because the statements were mere puffery upon which no investor would have reasonably relied. (*See* Jt. Decl. ¶ 68.) Being able

to prove falsity would not be enough, however. Plaintiffs would also have to show that the false statements were made with fraudulent intent or recklessness. Defendants had a number of arrows in their quiver to shoot down Plaintiffs' scienter contentions. (*Id.* ¶ 69.)

Establishing liability would be difficult for the Class. Establishing damages would also be no picnic. Plaintiffs would be required to demonstrate loss causation, which means Plaintiffs would have been required to prove that Defendants' deceptive conduct caused their claimed economic loss. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011). According to Plaintiffs, "Defendants had substantial arguments that at least some of the declines in the price of DFC Global common stock were not caused by revelations of the true facts concerning DFC Global's alleged false and misleading statements." (Jt. Decl. ¶ 73.) Moreover, Plaintiffs' damages may have been limited if Defendants were able to convince a jury that "Lead Plaintiffs could not reasonably establish any liability before February 2012, when the [Office of Fair Trading] announced that it was conducting an investigation of the U.K. payday lending industry, or, at the latest, before March 2013, when the [Office of Fair Trading] issued its report detailing the deficiencies observed from its investigation into the payday lending business in the U.K." (*Id.* ¶ 76.)

The Court finds that these factors weigh heavily in favor of approving the settlement.

6. *Risk of maintaining the class action through the trial*

"Under Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Prudential*, 148 F.3d at 321.

The parties have not pointed the Court to any specific argument beyond the general legal principle that class certification is always open to review. This factor is neutral.

11

7. *Ability of Defendants to withstand a greater judgment*

This factor takes on its greatest role in those cases in which the defendant's inability to pay led to a lesser financial settlement than would ordinarily be awarded. *See Krimes v. JPMorgan Chase*, Civ. A. No. 15-5087, 2017 WL 2262998, at *9 (E.D. Pa. May 24, 2017).

The Court has little information in the record to form a conclusion about this factor. "Here, while Defendants arguably could afford to pay more, Lead Plaintiffs respectfully submit that this factor should not be viewed as determinative by this Court." (Mem. of Law in Supp. of Lead Pls.' Mot. for Final Approval of Class Action Settlement and Plan of Allocation [Pls.' Mem.] at 22.) The Court agrees and finds that the fact that DFC Global could pay more does not weigh against approval of the settlement.

8. *Range of reasonableness of the settlement fund in light of the best possible recovery and in light of all the attendant risks of litigation*

The last two *Girsh* factors assess "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . compared with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322. In conjunction, these two factors ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004). "Notably, in conducting the analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Sullivan*, 667 F.3d at 324.

Counsel for the Class concedes that the damages recoverable are much greater than the settlement amount. (Pls.' Mem. at 22–23.) This concession, however, is based upon a best case

scenario, in which Plaintiffs were able to establish liability and loss causation for all of the alleged false statements and for the entire length of the Class Period. That scenario—complete and total victory throughout the entire course of complex securities litigation—occurs with the regularity of unicorn sightings. The risks here were real, and a misstep at any point in the litigation could have greatly reduced the damages, or forced the Class out of court entirely. Regardless, complete and total victory would only come after significant expenditures and years of fierce battle. These factors weigh in favor of approval of the settlement.

9. Prudential *factors*

The Court also concludes that the *Prudential* factors also weigh in favor of approving the settlement. First, this litigation has proceeded far enough that the lawyers and this Court can assess the probable outcome of a trial on the merits. Second, Co-Lead Class Counsel report that they are unaware of any related claims asserted by other classes or other claimants. Third, class members were afforded the opportunity to opt-out of the settlement agreement, though only one has done so. Fourth, as will be discussed below, the request for attorneys' fees is reasonable. Fifth, the procedure for processing individual claims is fair and reasonable.

**B.   Attorneys' Fees**

Class Counsel seeks an attorneys' fee award of 25 percent of the settlement fund, or $7,500,000 for work on litigation.

Rule 23(h) of the Federal Rules of Civil Procedure authorizes an award of "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." The court must direct a thorough review of the request for fees. *Gen. Motors*, 55 F.3d at 819. The party requesting fees must demonstrate the reasonableness of its request and therefore must submit

evidence to support its request. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

There are two methods for calculating attorneys' fees in a class action: the percentage-of-recovery method and the lodestar method. *Prudential*, 148 F.3d at 333. The lodestar method is used in statutory-fee-shifting cases. *Id*. (noting that lodestar method "is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation"). The percentage-of-recovery method is preferred when the fee is to be paid from a common fund "because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). Because this is a common fund case, the Court will employ the percentage-of-recovery method to determine the amount of attorneys' fees it will award Class Counsel. As suggested by the Third Circuit, the Court will then apply a lodestar cross-check to ensure the reasonableness of the award. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

In determining a reasonable percentage fee award, the Third Circuit requires the district court to consider ten factors: (1) the size of the fund created and the number of beneficiaries; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and (10) any innovative

settlement terms. *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009). These factors should not "be applied in a rigid, formulaic manner, but rather a court must weigh them in light of the facts and circumstances of each case." *Moore v. Comcast Corp.*, Civ. A. No. 08-773, 2011 WL 238821, at *4 (E.D. Pa. Jan. 24, 2011).

### 1. *The size of the fund and the number of beneficiaries*

The settlement fund is $30 million. Approximately 20,000 notice packets have been mailed to potential Class members. This is a large settlement fund that has the potential to benefit a great number of investors. This factor weighs in favor of approving the fee petition.

### 2. *Absence of substantial objections by members of the class to the fee request*

The notice of the settlement was sent to thousands of potential Class members and was posted on a publicly available website. No objections have been raised. The lack of objections weighs in favor of this award of attorneys' fees. *See Rite Aid*, 396 F.3d at 305 (two objectors out of 300,000 class members supported approval of the requested fees).

### 3. *The skill and efficiency of the attorneys involved*

This litigation involved impressive legal talent on both sides. Included as an exhibit to the fee petition is the firm biography of Barrack, Rodos & Bacine and the firm biography of Bernstein Litowitz Berger & Grossman LLP. As would be expected from a piece of legal advertising, the information contained in these biographies is glowing. Both firms have achieved significant successes and boast an impressive array of legal talent. The Class here was represented by skilled advocates who were able to achieve a large recovery.

### 4. *The complexity and duration of the litigation*

Securities litigation is tough stuff. *See In re Ikon Office Solutions, Inc. Secs. Litig.*, 194

F.R.D. 166, 179 (E.D. Pa. 2000) (noting the "inherently complicated nature of large class actions alleging securities fraud"). This alleged securities fraud matter is no different, and would have required significant resources to further delve into the payday loan industry. This litigation commenced in 2013, and since then, the parties have completed significant briefing and reviewed close to two million pages of documents.

Moreover, this litigation, had it not settled, would have continued far into the future. As counsel notes, significant discovery was still left to be conducted, including discovery with respect to merits, loss causation, and experts. Additionally, motion practice and jury preparation was on the horizon. Finally, the Court suspects that regardless of the outcome, an appeal was likely to follow. Given the complexity of the case and duration of the litigation, this factor weighs in favor of approving the fee petition.

### 5. *Risk of nonpayment*

There is a greater risk of nonpayment for cases taken on a contingent fee basis. *See Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 315 (E.D. Pa. 2012) (concluding that risk of nonpayment factor weighed in favor of approving fee petition because class counsel took the action under a contingency arrangement).

Here, counsel undertook this matter on an entirely contingent fee basis, which at least left open the possibility that counsel would receive little or nothing for their troubles. (*See* Mem. of Law in Supp. of Co-Lead Counsel's Mot. for an Award of Attorneys' Fees and Reimbursement of Litig. Expenses [Fee Petition Mem.] at 14-15.) This factor weighs in favor of approving the fee petition.

### 6. *The amount of time devoted to the case*

Counsel has spent over 20,000 hours and incurred close to half a million dollars in expenses

litigating this matter. (*Id*. at 15.) The attorneys worked a great deal of hours on the following: initially investigating the case; interviewing confidential witnesses; preparing the complaint researching and briefing Defendants' motion to dismiss; conducting and defending discovery; preparing and briefing the motion for class certification; and mediating this matter. This factor weighs in favor of approving the fee petition.

### 7. *Awards in similar cases*

In the Third Circuit, fee awards in common fund cases generally range from 19 percent to 45 percent of the fund. *See Bredbenner v. Liberty Travel, Inc.*, Civ. A. Nos. 09-905, 09-1248, 09-4587, 2011 WL 1344745, at *21 (D.N.J. Apr. 8, 2011). In fact, the Third Circuit has relied on studies that demonstrated that an average percentage fee recovery in large class action settlements is approximately 30%. *See Sullivan*, 667 F.3d at 333. Thus, a fee award of 25% of the total settlement here is reasonable and in keeping with similar precedent. *See McGee v. Cont'l Tire N. Am., Inc.*, Civ. A. No. 06-6234, 2009 WL 539893, at *16 (D.N.J. Mar. 4, 2009) (approving a 22%-31% fee award in a consumer fraud class action); *In re Linerboard Antitrust Litig.*, Civ. A. Nos. 98-5055, 99-1000, 99-1341, 2004 WL 1221350, at *14 (E.D. Pa. June 2, 2004) (citing a Federal Judicial Center study that found that in federal class actions the median attorneys' fee awards was between 27% and 30%).

### 8. *Additional factors*

There are three final factors that courts consider: the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and any innovative settlement terms.

These factors simply play no role here. Although there have been government investigations into the industry, there is no indication that such investigations played any role in the settlement here. Moving on, this litigation is being undertaken on a contingent fee basis, which makes the percentage fee that would have been negotiated irrelevant here. Finally, the parties have not alerted the Court to—nor has the Court uncovered—any creative settlement terms here.

### C. Lodestar Cross-Check

"The lodestar crosscheck is intended to gauge the reasonableness of the attorneys' fee award as a whole." *Milliron v. T-Mobile, USA, Inc.*, 423 F. App'x 131, 136 (3d Cir. 2011). In performing the lodestar cross-check, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305. The court may then apply a multiplier to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id.* at 305-06. If the multiplier that must be used in order to obtain the result reached by application of the percentage-of-recovery method "is too great, the court should reconsider its calculation under the percentage-of-recovery method." *Id.* at 306. However, because the cross-check is not the primary analysis in common fund cases, it does not require "mathematical precision []or bean-counting." *Id.* In evaluating the hours reasonably spent on the case, the Court does not have to "review actual billing records" but can "rel[y] on summaries submitted by the attorneys." *See id.*

Class counsel has submitted declarations demonstrating 20,885.65 hours of attorney and professional support staff in litigating this action. (Fee Petition Mem. at 18.) Using the relevant firms' 2016 hourly rates, the cumulative lodestar in this matter is $9,891,022.50. Counsel seeks 25%

18

of the settlement fund, which works out to $7.5 million. Thus, the multiplier here is approximately .76. A multiplier of .76 is well withing the range the Third Circuit has approved. *Prudential*, 148 F.3d at 341 (noting that multipliers from one to four are reasonable and frequently awarded in common fund cases); *see also In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 173 (3d Cir. 2006) (finding that 1.28 and 2.99 were acceptable multipliers).

The Court concludes that the lodestar cross-check provides further support for approval of the fee petition.

### D. Costs

Class Counsel seek litigation expenses totaling $472,462.44 for expert fees, research, court reporting and transcripts, photocopying, travel, and postage. (Fee Petition Mem. at 19-20.) Class counsel are "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *Moore v. Comcast Corp.*, Civ. A. No. 08-773, 2011 WL 238821, at *5 (E.D. Pa. Jan. 24, 2011). Items such as photocopying, telephone and fax charges, express mail charges, expert witness fees, travel and lodging, and computer-assisted research are necessary for the prosecution of a large class action lawsuit. Accordingly, class counsel are entitled to be reimbursed for those costs. *Soon Oh v. AT & T Corp.*, 225 F.R.D. 142, 154 (D.N.J. 2004).

Similarly, Lead Plaintiffs are also entitled to have certain costs reimbursed. *See* 15 U.S.C. § 78u-4(a)(4) ("Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."). Here, the Lead Plaintiffs, Arkansas Teachers Retirement System, Macomb County Employees Retirement System, and the Laborers' District

Council and Contractors' Pension Fund of Ohio, seek awards of $5,560, $7,080, and $9,000, respectively. (Fee Petition Mem. at 20-21.) As outlined in the fee petition memorandum, Lead Plaintiffs performed a number of tasks to aid in this litigation. Among theses tasks, Lead Plaintiffs reviewed pleadings and briefs, provided discovery, met with lawyers, prepared for depositions, authorized settlement discussions, and approved the settlement. (Fee Petition Mem. at 21.) These costs are documented and reasonable and Lead Plaintiffs are entitled to be reimbursed for them.

IV. **CONCLUSION**

Having reviewed the record before the Court and the parties' submissions, the Court concludes that the requirements of Rule 23 have been satisfied, and that the settlement is fair, reasonable, and adequate. Similarly, the request for attorneys' fees and costs is also reasonable. The Court therefore grants the motion to approve the settlement and for attorneys' fees and costs. Separate Orders approving the settlement, the plan of allocation, and the petition for attorneys' fees and costs will be docketed separately.